JOSEPH J. TALLAL, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tallal v. Commissioner
Docket No. 19237-80.
United States Tax Court
T.C. Memo 1984-486; 1984 Tax Ct. Memo LEXIS 186; 48 T.C.M. (CCH) 1082; T.C.M. (RIA) 84486; September 11, 1984. *186 Petitioner was a limited partner in Cumberland, which was a limited partnership formed on Oct. 27, 1976, to lease and mine coal property in West Virginia. On Oct. 28, 1976, Crescent, which was controlled by the general partners of Cumberland, subleased certain coal mining rights from Black Rock and agreed to pay an advanced royalty of $2,700,000, payable $1,200,000 in cash and $1,500,000 by a nonrecourse note. Also on Oct. 28, Cumberland subleased the same coal mining rights from Crescent, and agreed to pay Crescent an advanced royalty of $4,975,000, payable $1,975,000 in cash and $3,000,00 by a nonrecourse note. Petitioner became a limited partner on or about Dec. 27, 1976, at which time the transactions were closed. Cumberland never sold any coal, and made no payments of interest or principal on the note. On its information return for 1976 Cumberland claimed a deduction for the full amount of the advanced royalty. Petitioner claimed a loss of $72,396 as his distributive share of Cumberland's losses in 1976. Held,Cumberland was not engaged in the coal mining activity with the primary objective and intent of making a profit, so the advanced royalties are not deductible under sec. 162(a), I.R.C. 1954, *187 and petitioner is not entitled to deduct his distributive share of Cumberland's losses. Robert K. Dowd,Peter S. Buchanan, and Wade H. Hufford, for the petitioner. Val J. Albright,Raymond L. Collins, and Mark L. Puryear, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency of $26,474 in petitioner's 1976 Federal income tax. The deficiency resulted from the disallowance of a loss of $72,396 which petitioner claimed as his distributive share of the losses of The Cumberland Group, a limited partnership formed in 1976 Purportedly to lease and mine certain coal property in West Virginia. The following issues are presented for decision: (1) Whether the coal mining activity of the partnership was an activity engaged in for profit; (2) Whether section 1.612-3(b)(3), Income Tax Regs, as amended by T.D. 7523, 1978-1 C.B. 192, applies to prevent the deduction in 1976 of certain advanced royalties claimed by the partnership; (3) Whether there occurred an improper retroactive allocation of partnership losses to petitioner; (4) Whether a $3,000,000 nonrecourse note of the partnership, issued as partial payment of advance royalties, *188 should be recognized for Federal income tax purposes; (5) Whether and to what extent the $4,975,000 claimed by the partnership as an advanced royalty constitutes an ordinary and necessary business expense of the partnership for 1976. FINDINGS OF FACT
Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner Joseph J. Tallal, Jr. resided in Dallas, Texas when he filed the petition in this case. He and his wife, Pamela, timely filed a joint Federal income tax return for 1976 with the Internal Revenue Service Center at Austin, Texas. [1]
In 1976, petitioner was a personal financial manager. He advised clients on matters such as retirement and estate planning. He also advised clients on tax matters. Petitioner has no college degree. Prior to his investment in The Cumberland Group, he had no experience with the coal business. On or about December 28, [2] 1976, petitioner contributed $30,000 *189 in cash to The Comberland Group (Cumberland), a California limited partnership, and received a 1.5 percent limited partnership interest. Petitioner had learned about Cumberland from a friend, Steve Hayes, who helped organize and promote the partnership. Cumerland was formed on October 27, 1976. The general partner was Pacific Associates, a California general partnership consisting of Peter S. Buchanan, Steven L. Hayes, Donald Koppel and Richard S. Pritzker. The original limited partner was Jeffry G. Wagner. [3] Cumberland reported its income using the accrual method of accounting and a calendar year. Cumberland was conceived and organized by Buchanan, Hayes and Koppel. None of them *190 had any experience in coal mining prior to their involvement in the transactions herein. Buchanan was a practicing attorney in California, who was a certified specialist in tax law. [4] He handled Koppel's personal tax matters. Koppel was a vice president of the San Francisco Newspaper Company. He had been in the newspaper business since 1962. Koppel had a B.S. degree in mechanical engineering from the Georgia Institute of Technology. Before entering the newspaper business, he served in the Army as an engineer involved in missile research, and later was employed as a consulting engineer in South Africa. He had no knowledge of mining engineering. Hayes received a B.A. degree from the University of Arkansas in 1969. From 1970 through the summer of 1976, he was either employed by or a consultant to various businesses in Los Angeles and Dallas. As a consultant, he gained experience raising money for various business ventures. He also advised clients about investments in tax shelters involving movies. Hayes had known Buchanan since 1973, and the two ahd worked together on several movie projects. *191 [5] Hayes entered law school at Southern Methodist University in the fall of 1976. In July 1976, Buchanan, Hayes and Koppel organized Pacific Associates, a general partnership, through which they intended to pursue a venture purportedly involving the leasing and mining of coal. Although this partnership was somewhat informal, they agreed generally that Buchanan and Hayes would be responsible for the legal and financial aspects of the venture, while Koppel would investigate various coal properties. Although Koppel continued to be employed full-time in the newspaper business, he testified that he made several trips to Southeast during the summar and fall of 1976 in order to investigate coal properties. At times he was accompanied by Hayes or Buchanan. During the course of his search, Koppel was referred to Frank Gaddy, a professional coal mining consultant in Huntington, West Virginia doing business as Gaddy Engineering *192 Company. Gaddy was retained by Pacific Associates to provide engineering services in connection with the search for coal property. Some time in the late summer or early fall, Pacific Associates contacted Martin Pomerance, a tax lawyer in a New York firm that was known to have expertise in coal ventures. The partnership retained Pomerance's firm to represent it in negotiating coal leases and to structure the proposed venture. In September, Buchanan, Hayes and Koppel acquired all the stock of a California corporation previously owned by Koppel and changed its name to Crescent Coal Company (Crescent). The three men also served as officers and directors of Crescent. Later, in October, Richard Peitzker became a partner in Pacific Associates and a shareholder, officer and director of Crescent. Pritzker had degrees in accounting and law. Through Pomerance or others in his law firm, Hayes was introduced to Gary Spirer, who was said to possess desirable coal property in West Virginia. Spirer and Rodman Thompson were the two partners in Black Rock Coal Company (Black Rock), a West Virginia partnership. During October, Hayes and Spirer had discussions concerning the possibility of Crescent *193 acquiring a leasehold interest in certain coal reserves in Mingo County, West Virginia. Hayes had learned from Pomerance that Gaddy had prepared an engineering report in 1972 that indicated that the Mingo County property contained more than six million tons of coal reserves. The Mingo County coal property was a 464 acre tract [6] known as the "Low Gap Tract," which was owned by Cotiga Development Corporation (Cotiga). Cotiga, a Delaware corporation, was a large land holding company. [7] Spirer's partner in Black Rock, Rodman Thompson, was also a vice president of Cotiga. The Cotiga-Black Rock Lease
On October 5, 1976, Cotiga and Black Rock executed a a written agreement (the "Lease") under which Cotiga granted Black Rock the right to mine and remove "all of the coal *194 in all seams" of the Low Gap Tract. The Lease was for a term of fifteen years, but provided for an automatic renewal for an additional ten year period if, at the expiration of the original fifteen years the coal had not been exhausted. Under the Lease, Black Rock was required to pay Cotiga a "minimum annual rental" of $10 per acre ($4,640), without regard to the amount of coal mined and removed from the property. In addition, the Lease required Black Rock to pay tonnage royalties in amounts which varied according to the mining method employed. [8] The "minimum annual rental" could be recouped from the tonnage royalties in the event that coal was produced. The Lease also required Black Rock to initiate mining operations within one year, and "energetically prosecute such operations so as to achieve reasonable coal production." The Cotiga-Black Rock lease envisioned sublease *195 agreements, first between Black Rock and Crescent, and then between Crescent and an unidentified limited partnership controlled by the "affiliates" of Crescent. Specifically, the Lease provided that Black Rock shall have the right to re-sublet the leashold estate hereby created to Crescent Coal Company, which in turn shall have the right to further re-sublet the leasehold estate hereby created to a limited partnership in which affiliates of Crescent Coal Company are the general partners . . . [9]
Sometime during October, Hayes received a telephone call from an attorney in Pomerance's law firm who informed him that they expected the Internal Revenue Service to make an announcement on October 29 which would concern the tax implications of the proposed coal venture. Hayes testified he was told that "if you don't want to have wasted all of your time up to now, you had better see if you can conclude these transactions." [10] *196 On October 27, 1976, Cumberland was formed as a limited partnership under the laws of the State of California, having as its general partner Pacific Associates and its limited partner Jeffrey G. Wagner. Pacific Associates, Crescent and Cumberland each had the same mailing address in San Francisco. The Black Rock-Crescent Sublease
On October 28, 1976, Black Rock and Crescent entered into an agreement (the Original Sublease) whereby Crescent subleased the coal mining rights to the Low Gap Tract held by Black Rock under its lease with cotiga. Except for the royalty provisions discussed below, the terms of the Original Sublease were identical to those of the Lease, and Crescent obtained the rights to all of the coal in each seam underlying the *197 coal property. Under the Original Sublease, Crescent was to pay to Black Rock an "advanced or minimum royalty." [11] of $2,700,000. Crescent was "unconditionally" obligated to pay this amount, irrespective of whether Crescent mined any coal from the tract. The "advanced or minimum royalty" was to be paid by $1,200,000 cash and by a $1,500,0000 nonrecourse promissory note. The $2,700,000 advance royalty was subject to recoupment over the term of the sublease out of the tonnage royalties which would otherwise be payable to Black Rock on any coal actually mined, removed and sold by Crescent. The Original Sublease initially provided for an "overriding tonnage royalty" of seven percent of the gross selling price of each ton of coal mined by deep-mining methods, and eight percent of the gross selling price for each ton of coal removed by strip-mining or auger-mining methods. *198 However, on December 29, 1976, Black Rock and Crescent entered into an agreement to amend the Original Sublease. Under the amended sublease, Crescent was required to pay tonnage royalties, based on a percentage of gross selling price per ton, of 7-1/4 percent for deep-mined coal, 8-1/4 percent for stripmined coal, and 9 percent for auger-mined coal. The amended Original Sublease also provided that Crescent would perform all of Black Rock's obligations under the Lease, with the exception of any royalties payable to Cotiga, which remained the obligation of Black Rock. The $1,500,000 nonrecourse promissory note payable to Black Rock under the Original Sublease was executed by Crescent on December 29, 1976, at the time of the closing of the sublease agreements herein. The note provided for eight percent interest on its unpaid balance and was payable $120,000 on December 31, 1977, with thirty-six quarterly payments thereafter of $59,000 each, the first of which would be due March 31, 1978 and the last of which would be due December 31, 1986. The note also provided for an eighteen month grace period for any late installment before Black Rock would have the right to declare Crescent in *199 default. The note was secured only by the coal rights held by Crescent under the Original Sublease. At the time the note was executed, Crescent and Black Rock executed a document entitled "Deed of Trust and Security Agreement" by which Crescent granted Black Rock a security interest in the mining rights to the Low Gap Tract. Pomerance was designated as trustee under the deed of trust. The note provided with respect to this security agreement: This note is secured pursuant to a certain security agreement dated of even date herewith between [Crescent] and [Black Rock] . . . under which [Crescent] has pledged certain collateral . . . and this note is payable out of collateral only. The Original Sublease, dated October 28, 1976, was executed by Rodman Thompson for Black Rock. Thompson's signature was notarized by a Notary Public in Chester County, Pennsylvania. [12]
It is not clear who signed for Crescent. [13] Neither Buchanan, Hayes, Koppel, Pritzker or Pomerance executed the document. Although Koppel was to be responsible for selecting the coal property, he testified that he never met Thompson in 1976. Hayes testified that he first met Thompson in either late October or early November. *200 The Crescent-Cumberland Sublease
On October 28, 1976, Crescent and Cumberland entered into an agreement (the Sublease) whereby Cumberland subleased from Crescent the coal rights held by Crescent under its sublease agreement with Black Rock. Unlike the Original Sublease, the agreement between Crescent and Cumberland specified six discrete seams of coal which Cumberland would be entitled to mine. [14]
The agreement provided: Subject to all of the conditions set forth herein [Crescent] hereby subleases to [Cumberland], and [Cumberland] hereby subleases from [Crescent], all of [Crescent's] rights and privileges to mine, extract and remove the Stockton, Coalburg, Winifrede, Upper Ceder Grove, Lower Cedar Grove and Alma coal contained on, in or under [the Low Gap Tract] . . . subject to Crescent entering the *201 Original Sublease on or before December 31, 1976. Under the Sublease, Cumberland was obligated to pay Crescent a nonrefundable "advanced or minimum royalty" of $4,975,000.[15] The advanced royalty was payable $1,975,000 in cash and the balance by a $3,000,000 nonrecourse promissory note. The agreement specified that the note would bear interest at eight percent and was payable $240,000 on December 31, 1977 with thirty-six equal quarterly payments of $118,000 commencing March 31, 1978 and ending December 31, 1986. The advanced royalty was subject to recoupment over the term of the Sublease out of the first $4,975,000 of production royalties that would otherwise be payable to Crescent. The Sublease required *202 Cumberland to pay Crescent production royalties of nine percent of the sales price of all coal mined, removed and sold from the Low Gap Tract. The Sublease contained the following provision: 3. Conditions Precedent to Consumation of Sublease.
[Crescent] shall be required to deliver to [Cumberland] or its designated representatives the following documents and instruments on or before the Closing Date: (a) A coal mine operating agreement with respect to [the Low Gap Tract] with a reputable and financially responsible coal mining organization approved by [Cumberland], which approval shall not be unreasonably withheld, pursuant to which the coal mine operator will agree (i) to mine and remove from Upper Cedar Grove, Lower Cedar Grove and/or Alma coal seams as agreed to by [Cumberland], not less than 7,500 tons per month, not later than May 1, 1977, to mine and remove *203 not less than 15,000 tons per month, not later than September 1, 1977 and to mine and remove not less than 20,000 tons per month by March 1, 1978, and to deliver such coal to the distance of the U.S. Steel Corporation Cleaning Plant at Thacker, Mingo County, West Virginia, for a term of not less than three years commencing January 1, 1977 and ending December 31, 1979, all at a compensation not to exceed $14.25 per clean ton of coal, exclusive to West Virginia Business and Occupation Tax, and (ii) [Cumberland] shall have the right to purchase any equipment which such coal mining organization uses with respect to the coal mining operation at [the Low Gap Tract] upon such terms as are mutually acceptable to [Cumberland] and said coal mining organization. (b) A revised Engineering Report by Gaddy Engineering Company or such other reputable independent engineering firm of recognized standing in the locality in which [the Low Gap Tract] is situated specifying that [the Low Gap Tract] has Recoverable Proven Reserves of such coal as defined in the Original Sublease, meeting the specifications set forth in the original Engineering Report of Gaddy Engineering Company. * * * The Sublease was *204 executed in San Francisco by Koppel (as president of Crescent and as general partner in Cumberland) and Buchanan (as secretary of Crescent and as general partner in Cumberland). [16] The agreement expressly provided that it would be construed and interpreted in accordance with California law. On December 29, 1976, the closing date of the Sublease and the Original Sublease, Cumberland executed a nonrecourse promissory note in the amount of $3,000,000, on terms as provided in the Sublease. With the exception of the principal amount and the amount of the periodic payments, the terms of the note were identical to those of the note executed by Crescent under the Original Sublease. The note allowed an eighteen-month grace period for the payment of installments. The note was secured by all the assets and property of Cumberland, including the coal rights it held under the Sublease. [17] On December 29, 1976, Hayes and Buchanan executed a "Deed of Trust *205 and Security Agreement" under which Cumberland granted Crescent a security interest in the collateral (the assets of Cumberland). Jeffrey G. Wagner, the original limited partner who withdrew from the partnership on December 27, was appointed as trustee. Like the note delivered to Black Rock by Crescent, the note provided: This note is secured pursuant to a certain security agreement dated of even date herewith between [Cumberland] and [Crescent]. . . under which [Cumberland] has pledged certain collateral . . . and the note is payable out of collateral only. In November 1976, Frank Gaddy revised the study of the coal reserves on the Low Gap Tract which he originally had prepared for Cotiga in 1972. [18] The original report estimated that there were 6.6 million tons of recoverable coal reserves on the tract. Because *206 of his determination that no mining had occurred on the tract since 1972, Gaddy made no substantive revisions of the report, and merely had it retyped. Gaddy was paid $3,500 for his services to Cumberland in 1976. The revised report was formally delivered by Crescent to Cumberland, in accordance with the terms of the Sublease, and its content was summarized in the Private Placement Memorandum distributed by Cumberland on December 10, 1976. Also by the time of the distribution of the Private Placement Memorandum, Cumberland had reached an agreement (the Mine Operating Agreement) with B-Rock Mining Company (B-Rock), according to which B-Rock would be retained as an independent contractor to perform contract mining and transportation services on the Low Gap Tract.B-Rock was a West Virginia corporation organized in 1976 by Rodman Thompson, Gary Spirer and Rayburn Wolford, who were its officers, directors and sole shareholders. [19] *207 Thompson and Wolford had substantial experience in the coal business. The Mine Operating Agreement was for a term of three years had provided that B-Rock would receive $14.25 for each ton of coal mined, removed and delivered to a specified preparation plant in Mingo County. B-Rock was obligated to produce 80,000 tons of coal in 1977, 175,000 tons of coal in 1978, and 200,000 tons in 1979. [20] B-Rock was required to supply all necessary mining equipment, provide working capital of $200,000, and obtain a line of credit of $100,000. The agreement also provided that Cumberland would have the right to purchase the mining equipment from B-Rock upon the termination *208 of the agreement or a willful breach of its terms by B-Rock. The Mine Operating Agreement was formally executed on December 29, 1976. On December 10, 1976, an "Amended Private Placement Memorandum" [21] (the prospectus), describing Cumberland and the proposed coal venture, was distributed to potential investors, including the petitioner. The prospectus proposed to sell forty units of $50,000 each. [22] The prospectus contained discussions of the various subleases and other agreements; risk factors associated with the investment; certain conflicts of interest inherent in the venture (especially the general partners' control of Crescent); the nature of the coal reserves; the proposed mining operations; and the federal income tax consequences of an investment in the partnership. The largest section of the prospectus, comprising roughly half of the document, was devoted to the income tax aspects of the venture. The prospectus stated that the discussion of the income tax issues had been reviewed and approved by Pomerance's law firm, and that on the closing date the firm would deliver to the partnership an opinion concerning the classification of Cumberland as a partnership for federal income *209 tax purposes and the deductibility of the "advanced or minimum royalty" payment. [22] The firm was counsel to both Cumberland and Pacific Associates. Some of the "risk factors" discussed in the prospectus included the possibility of the decline of market prices of coal; the absence of any output contract for the purchase of coal produced from the Low Gap Tract; the possibility that the mine operator may not be able to conduct operations profitably given increasing expenses and labor problems; the complete reliance on the mine operator given the general partners' lack of experience in coal mining; and the impact of current and prospective environmental laws and regulations governing mining. The following caveat appeared in bold type on page two of the prospectus: [24]
Moreover, on October 29, 1976 the Service suspended two Revenue Rulings and proposed a modification of a Treasury Regulation, all of which relate to the federal income tax treatment of advanced *210 or minimum royalty payments made pursuant to coal or other mineral leases. The proposed regulation, by its terms, does not affect the deductibility of advanced or minimum royalty payments that are made pursuant to leases that either were binding on the payor of the royalty prior to October 29, 1976 or were required to be executed by the payor pursuant to a written contract that was binding on the payor prior to such date. As a result of uncertainty as to whether the partnership cna qualify for the foregoing exception, counsel to the partnership is unable to express an unqualified opinion that the advanced or minimum royalty payment to be made by the partnership on the closing date will be deductible by the partnership for its 1976 taxable year. . . . [emphasis supplied]. The Private Placement Memorandum did not contain any financial projections regarding the proposed coal mining activities of Cumberland. However, Hayes and Pritzker prepared a ten-year financial projection of the partnership's operations, based on certain *211 assumptions regarding the expected levels of production, costs of production, and sales price of coal. [25] *212 For 1976, based on the deduction of the $4,975,000 advance royalty and no coal production, Hayes and Pritzker projected a net loss of $4,975,000, a "net after tax cash flow" of $412,500, and a "cash on cash return after tax" of 121%. [26] For later years they projected steady operating profits, beginning in 1977 at $149,160, rising to $618,304 in 1978, and rising steadily thereafter with a projected net operating profit of $950,272 in 1986. [27] A "spread sheet" containing these financial projections was provided to petitioner at the time he was considering in investment in Cumberland, and he discussed it with Hayes. Although the tax write-off was discussed, petitioner was also interested in an investment that would provide an "income stream," and he found the coal venture attractive because of the possibility that the energy crisis could lead to an increase in coal prices. Petitioner relied *213 on the spread sheet and Gaddy's report on the coal resources in deciding to invest in Cumberland. On December 27, 1976, the partnership agreement was amended to reflect the withdrawal of the original limited partner and the admission of thirty-four new limited partners who collectively contributed $2,000,000 of capital to Cumberland. Most of the investors contributed $50,000 for a full "unit," and received a 2.5 percent interest in the profits and losses of the partnership. Petitioner contributed $30,000 and received a 1.5 percent interest. The amended partnership agreement allocated ninety-five percent of all net income or loss of Cumberland to the limited partners and five percent to the general partner until "payout." [28] After payout the net imcome or loss was to be allocated sixty percent to the limited partners and forty percent to the general partner. However, the deduction claimed with respect to the $1,975,000 cash portion of the advance royalty was allocated one-hundred percent to the limited partners. Pacific Associates, as general partner, contributed $20,000 of capital to the partnership. *214 [29] In addition to its respective share of partnership profits and losses, Pacific Associates was to receive, for management services, one dollar per ton of coal produced, and for general and accounting services, one dollar per ton of coal produced. As of December 27, 1976, Cumberland's assets consisted of $2,020,300 cash and the mining rights it received under the sublease. Pursuant to the Sublease however, Cumberland paid Crescent $1,975,000 as the cash portion of the advance royalty. In addition, Cumberland incurred $5,000 of organizational expenses. Cumberland retained $40,300 as working capital. [30]
The sublease agreements involving Black Rock, Crescent and Cumberland were closed on December 29, 1976. On that date, Cresent executed the $1,500,000 note payable to Black *215 Rock; Cumberland executed the $3,000,000 note payable to Crescent; Crescent and Cumberland executed the deeds of trust granting security interests in the coal rights to their respective sublessors; the Black Rock-Crescent sublease was amended as hereinbefore discussed; and the Mine Operating Agreement was executed. Two additional agreements were executed on December 29. Cotiga, Black Rock, Crescent and Cumberland executed an "Access Agreement," which allowed Cumberland access to the Low Gap Tract for the purpose of conducting mining operations. Cumberland also executed a "Coal Brokerage Agreement" with Black Rock Sales, a West Virginia partnership controlled by Thompson and Spirer. [31] *216 Under this agreement, Black Rock Sales agreed to "use its best efforts to assist the Partnership to obtain [sic] output contracts for the purchase of coal . . ." Black Rock Sales was to receive an unstated [32] percentage of sales monthly as a commission, but only if the average sales price of the coal for a given month exceeded $25.50 per ton. Crescent received $1,975,000 from Cumberland pursuant to the Sublease. Crescent made the following disbursements from those funds: $1,200,000 to Black Rock as the cash portion of the advance royalty under the Original Sublease; $150,000 in "finder's fees" to persons who solicited investors in Cumberland; $60,000 to Pomerance's law firm; $150,000 to pay Federal income taxes for 1976; $70,000 in compensation and expense reimbursements to the officers of Crescent; [33] and $3,500 to Gaddy for the revised report on the coal reserves. Crescent also represented to Cumberland that it would retain $200,000 in reserve in the event that Cumberland required additional capital. The disposition of the remaining $141,500 is not clear; nor is there any evidence that Crescent made any loans to Cumberland with the $200,000 purportedly retained for that purpose. Hayes testified that Crescent maintained a cash balance of $250,000 in 1978, but could not account *217 for the disposition of the funds after that date. [34] Crescent did not have a substantial cash balance at the time of the trial. In early 1977, Gaddy prepared a mining plan for the production of coal from the Alma seam on the Low Gap Tract. In that connection, he obtained that necessary permits from various regulatory authorities in order to conduct mining. Gaddy experienced delays because of changes in certain laws and regulations governing mining and because of a flood in Mingo County. At various times in 1977 and 1978, strikes by members of the United Mine Workers Union and "wildcat" coal miners curtailed coal mining in Mingo County. *218 Sometime in the spring of 1978, mining equipment was moved to the opening of the Alma seam. [35] Gaddy visited the site when the equipment was present, and recalled seeing two sets of mining equipment.All of the equipment was portable. The equipment was moved off the site sometime during the fall of 1978. It is not clear who owned the mining equipment. Gaddy believed that it was owned by B-Rock Mining. [36] Gaddy also indicated that the equipment may have been moved from the site for security purposes, because of the strikes. Gaddy estimated that the mining *219 equipment he saw at the Alma seam was capable of producing 18,000 tons of coal per month, if both sets were operated on a two-shift basis. Coal was mined from the Alma seam sometime between June and September 1978. Production ceased during a time when striking coal miners picketed the mine. No mining was conducted after September 1978. A total of 14,000 tons of coal were produced from the Low Gap Tract. [37]
Gaddy had been in business as a coal mining consultant since 1968, when he founded Gaddy Engineering Company. He had a master's degree in mining engineering, and was a registered engineer in several states. He was a member of various professional societies and was past president of the West Virginia Coal Mining Institute. He had been involved in coal mining since 1948. Gaddy Engineering employed eighteen people and had more than two hundred clients. Gaddy's revised report on the coal reserves of the Low Gap Tract contained no substantive changes from his original report which he had prepared for Cotiga in 1972. *220 [38] The report estimated that there were 6.6 million tons of recoverable coal in six mineable seams on the coal tract: Seam
Recoverable Reserves (in tons)
Stockton
20,000
Coalburg
211,000
Winifrede
1,514,000
Upper Cedar Grove
1,533,000
Lower Cedar Grove
1,633,000
Alma
1,702,000
TOTAL
6,613,000
The estimates of recoverable reserves in Gaddy's report were based on recovery rates of sixty-seven percent for deep mining, and eighty percent for surface mining.Gaddy's plan for mining the Alma seam, however, projected recovering eighty-five percent of the coal in place. His practice was to use a slightly lower recovery rate when calculating reserves, as a margin of safety. He generally insisted on a recovery rate of at least eighty percent when he managed coal property. [39] Gaddy also testified that a production rate from the Alma mine of 20,000 tons per month was feasible, [40] that $14,25 per ton was a reasonable fee to pay B-Rock, and that the sales price of coal in Mingo County in 1976 ranged from twenty-five to twenty-nine dollars per ton on a shipped-ton basis. He also estimated the value of the coal reserves in place to *221 be between $ .75 and $1.25 per ton. The Low Gap Tract was described in Gaddy's report as "characterized by steeply sloping hillsides, with little or no bottom land for farming . . ." The Stockton seam lay close to the ridge of a 1,980 foot mountain. The report stated that: [The Stockton seam] is particularly suitable for surface mining methods providing the slopes of the hillside are not too steep. No effort has been made in this study to ascertain the steepness of the hillsides and all surface mining could be rendered unmineable by present day regulations governing this method of mining. Gaddy could not explain why a similar caveat was not included with respect to the surface mineable reserves in the Winifrede seam. [41] *222 The original 1972 report stated that the Upper Cedar Grove and Alma seams had been mined previously. In preparing the report for Cumberland in 1976, Gaddy did not change any of the estimates of recoverably reserves because he concluded that there had been no coal mining on the Low Gap Tract since 1972. Gaddy did not inspect the various seams to confirm this assumption. However, he managed property in Mingo County, was frequently in the area between 1972 and 1976, and never observed any mining on the tract. It was later discovered that the Upper Decar Grove seam had been completely mined out by 1976. It was also discovered that the Stockton seam had been mined, and that the Alma seam had been mined to a greater extent than previously believed. Gaddy testified that the report contained "mistakes" and "inconsistencies." Gaddy subsequently revised his estimate of recoverable reserves on the tract downward by three million tons. [42]
Gaddy was *223 named as a defendant, along with Cotiga, Black Rock, B-Rock, and other parties, in a suit filed by Cumberland in 1980 or 1981, concerning the Low Gap mining venture. Gaddy did not participate in any of the hearings or settlement negotiations, and did not pay any money to Cumberland as a result of the suit. Gaddy testified that he "assumed that somebody questioned the report." Respondent introduced into evidence a report on the Low Gap Tract coal reserves prepared by W. G. Hooper, a valuation engineer. [43] Hooper conducted a field examination of the property in September, 1978. His report stated: Current operations, until shut down by a United Mine Workers strike, consisted of refurbishing the portal, haulage-way and ventilation system at the Bee Rock mine where the taxpayer was attempting to reopen the Alma coal seam. The Alma seam was apparently mined, by prior operators, about 200 feet further into mine than indicated on underground maps supplied to taxpayer. [44] *224 Hooper applied different assumptions concerning recovery rate and the mineability of certain seams, and concluded that the tract contained 3,355,000 tons of recoverable coal. Hooper assumed a fifty percent recovery rate for coal mined by deep-mining methods, whereas Gaddy assumed a sixty-seven percent recovery rate. Gaddy testified that a fifty percent recovery rate was "extremely conservative" and "unrealistic" in Mingo County. Hooper concluded that the Stockton seam was too thin to be mined.He also concluded there were insufficient intervals [45] between the various Coalburg seams to allow mining of all three seams. Gaddy disputed both of these conclusions. Hooper's report stated: The Coalburg coal sequences could possibly be mined at some time in the future but certainly would need exploration prior to any development . . . The area is highly timbered, in rugged terrian and would also require considerable work and expense to make accessible to mining *225 operations. Hooper's estimates of the thickness of certain coal seams, coal acres, and recoverable reserves differed from Gaddy's as follows: Coal Bed
Gaddy's Estimates
Hooper's Estimates
Average
Coal
Recoverable
Average
Coal
Recoverable
Height
Acres
Reserves x
Height
Acres
Reserves x
Stockton
64"
3
20
y
y
y
Coalburg
68"
31
211
39"
35
z 215
Winifrede
74"
202
1,514
36"
150
405
Upper Cedar Grove
42"
374
1,533
38"
300
865
Lower Cedar Grove
38"
441
1,633
36"
350
145
Alma
40"
436
1,702
32"
395
925
6,613
3,355
Hooper's estimate of 3,355,000 tons of recoverable reserves included an estimate of 865,000 tons in the Upper Cedar Grove seam. It was later discovered that the Upper Cedar Grove seam had been completely mined out. When adjusted for this development, Hooper's report estimates 2,490,000 tons of recoverable reserves. Hooper concluded that in *226 order to recoup the $4,975,000 advanced royalty from the Alma seam the price of coal would have to approximate sixty dollars per ton over the life of the reserves. [46] The report stated that in order to develop other seams "substantial additional costs would be incurred to explore, rehabilitate, increase mining equipment and develop this potential." [47] Cumberland did not have specific plans to mine additional seams, other than Alma, in 1978. [48]
In 1980 or 1981, Cumberland sued Cotiga, Black Rock, B-Rock, Gaddy, Thompson, Spirer, and Pomerance's law firm. [49] *227 Cumberland ultimately received $650,000 from the law firm and $500,000 from Cotiga in a settlement of the suit. At the time of settlement, Cotiga took possession of the Low Gap Tract. Cumberland made no payments of principal or interest on the $3,000,000 nonrecourse note payable to Crescent. However, on its Federal income tax returns for 1976 through 1980, Cumberland accrued and deducted $1,101,072 of interest on the note. Cumberland filed a U.S. Partnership Return of Income (Form 1065) for its short taxable year beginning October 28, 1976 and ending December 31, 1976. This return claimed total deductions of $4,975,166, consisting of the $4,975,000 advance royalty and $166 of amortization of the $5,000 organizational expenses. Cumberland reported no income for 1976. Cumberland claimed losses on its 1977 through 1980 partnership returns as follows: Year
Loss
1977
$239,061
1978
257,825
1979
284,697
1980
304,215
These losses were attributable solely to interest accrued and deducted on the $3,000,000 note payable to Crescent. On his 1976 Federal income tax return petitioner claimed a loss of $72,396 as his distributive share of the losses of Cumberland. In a notice of deficiency *228 dated July 11, 1980, respondent disallowed the $72,396 loss in its entirety. Respondent determined that the deduction for the advance royalty was disallowed because it had not been established that the transaction between Cumberland and Crescent contained economic substance. Alternatively, respondent determined the advance royalty was not currently deductible because it had not been established that the Sublease was binding, or that it imposed substantial and non-illusory obligations on Cumberland, prior to October 29, 1976. By Amendment to Answer to Second Petition, respondent asserted additional alternative grounds for the disallowance of the loss. Respondent contends that the obligations, liabilities or debts giving rise to the deductions were incurred prior to the time that petitioner became a member of Cumberland, and may not be retroactively allocated to him. Respondent also contends that the liability incurred with respect to the advance royalty is speculative, contingent and nonbinding, and therefore petitioner cannot claim any portion of the liability as part of his adjusted basis in the partnership. OPINION Petitioner claimed a loss of $72,396 as his distributive share *229 of the losses of Cumberland in 1976. Cumberland, a limited partnership, was formed on October 27, 1976 by Buchanan, Hayes, Koppel and Pritzker, purportedly to lease and mine certain coal property in Mingo County, West Virginia. Those four individuals, doing business as Pacific Associates, were Cumberland's general partners. Cumberland's reported loss for 1976 was attributable almost entirely to its deduction of an advance royalty in the amount of $4,975,000, paid (by $1,975,000 cash and a $3,000,000 nonrecourse promissory note) to Crescent, from which Cumberland subleased the coal mining rights to the Low Gap Tract. Crescent was also controlled by Buchanan, Hayes, Koppel and Pritzker. On the same day (October 28, 1976) that it subleased the coal rights to Cumberland, Crescent subleased the identical rights from Black Rock, and agreed to pay Black Rock an advanced royalty of $2,700,000 (payable $1,200,000 in cash and $1,500,000 by a nonrecourse promissory note). Earlier in October, Black Rock had leased the same coal rights from Cotiga under an agreement that obligated Black Rock to pay an annual rental fee of only $4,640 per year. Petitioner was admitted as a limited partner *230 in Cumberland on December 27, 1976 and contributed $30,000 for a 1.5 percent interest in the partnership's profits and losses. The sublease agreements between Cumberland, Crescent and Black Rock were closed on December 29, at which time Cumberland paid Crescent $1,975,000 in cash (out of the $2,000,000 contributed by the limited partners) and executed a $3,000,000 nonrecourse promissory note, which was secured principally by the coal mining rights. After paying the advance royalty and organizational expenses, Cumberland retained only $40,300 as working capital. Although a modest amount of coal was mined in 1978 during operations to open the Alma mine, Cumberland never sold any coal. The partnership reported no income in 1976, and only small amounts of interest income in its taxable years 1977-1980. Cumberland never made any payments to Black Rock of interest or principal on the note, but deducted accrued interest on the note for taxable years 1977-1980. Respondent makes various alternative arguments supporting his disallowance of the loss claimed by petitioner. Respondent's primary argument is that Cumberland was not engaged in any coal mining activity with a bona fide objective *231 of making a profit, but was created merely as a tax shelter for the limited partners who, by virtue of the large advance royalty "paid" mostly with nonrecourse debt, claimed deductions in 1976 for losses far exceeding their cash contributions. Before turning to this issue, however, it may be helpful to outline the issues concerning the amended regulations under section 612, [50] which provide a framework for analyzing the transactions herein. [51]
A royalty interest, for Federal tax purposes, is a right to minerals in place that entitles the royalty owner to a specified fraction, in kind or in value, of the total production from the property, free of expense of development and operation. F. Burke and R. Bowhay, Income Taxation of Natural Resources, par. *232 2.03 (1982). Royalties have been described as akin to rent and are deductible by the payor as a trade or business expense under section 162(a)(3). Burnet v. Hutchinson Coal Co.,64 F.2d 275 (4th Cir. 1933); Surloff v. Commissioner,81 T.C. 210, 232 (1983); c.f. section 62(5); section 1.62-1(c)(8), Income Tax Regs.
Although a royalty by its very nature must be linked to the production of the mineral, it has long been recognized that, in certain circumstances, royalties paid in advance of actual production are deductible when paid, as long as the payments are subject to recoupment out of (credited against) production royalties otherwise payable at the time the mineral is produced. Burnet v. Hutchinson Coal Co.,supra. Normally, advance royalties are paid pursuant to a lease requiring annual minimum royalty payments which are designed to approximate the amount of royalties that would accrue at a certain level of production. The agreement might provide that the advance royalty payments are recoupable not only out of production within the year paid, but also in later years if actual production falls short of the projected level in a given year. See, e.g., Burnet v. HutchinsonCoal Co.,supra. *233 Such an annual minimum royalty provision benefits the lessor because it operates as an economic incentive to the lessee to commence production as quickly as possible. The advance royalty must be distinguished from the lease bonus, which is a payment made as an inducement for the lessor to enter into the lease, and is not recoupable out of future production.A bonus is not deductible when paid but must be amortized over the life of the lease. Fitzsimons v. Commissioner,37 T.C. 179 (1961); F. Burke and R. Bowhay, Income Taxation of Natural Resources, pars. 4.02,18.22 (1982); Sec. 1.162-11(a), Income Tax Regs; c.f. section 1.612-3(a)(3), Income Tax Regs.
Prior to the amendment in 1977 of the regulations under section 612, concerning the treatment of advance royalties, [52] it was clear that payments made pursuant to an annual minimum royalty, as described above, were deductible in the year paid even if no production (or insufficient production to recoup the royalty payment) occurred during the year. However, it was not clear to what extent payments of "lump sum" advance royalties -- royalties paid at the outset of the lease, with no requirement for uniform annual payments over the lease *234 term -- were deductible in the year of payment. The relevant portion of sec. 1.612-3(b), Income Tax Regs, prior to amendment, read as follows: * * * (b) Advanced Royalties.(1) If the owner of an operating interest in a mineral deposit . . . is required to pay royalties on a specified number of units of such mineral . . . annually whether or not extracted . . . within the year, and may apply any amounts paid on account of units not extracted . . . within the year against the royalty on the mineral . . . thereafter extracted or cut . . . * * * (3) The payor, at his option, may treat the advanced royalties so paid or accrued in connection with mineral property as follows: (i) As deductions from gross income for the year the advanced royalties are paid or accrued * * * [emphasis supplied] The language of the old regulation, *235 specifying that the advance royalties were required to be paid "annually," would seem to preclude the deduction of lump sum payments. See Redhouse v. Commissioner,728 F.2d 1249, 1251 (9th Cir. 1984), affg. Wendland v. Commissioner,79 T.C. 355 (1982); Wendland v. Commissioner,supra,79 T.C. at 383-385; Pomerance, Coal-leasing arrangements offer substantial tax-shelter benefits,44 J. Tax'n 350 (1976). [53] However, a revenue ruling published by respondent in 1974 indicated that such a lump sum advance royalty would be deductible. Rev. Rul. 74-214, 1974-1 C.B. 148. It is that ruling upon which petitioner relies heavily in this case, despite the fact that it was quite clear, two months prior to the closing of the transactions herein, that respondent regarded Rev. Rul. 74-214 as an erroneous interpretation of the law. At the same time he announced the proposed amendment of the regulation (discussed below), respondent also announced the suspension of the ruling. On October 29, 1976, respondent announced a proposed amendment of section 1.612-3(b), Income Tax Regs. *236 News Release IR-1687, October 29, 1976. The amended regulation established the general rule that a payor of advance royalties must treat them as deductions from gross income for the year the mineral product, with respect to which the advance royalties were paid or accrued, is sold. However, an exception to this rule was provided in the case of advanced mineral royalties paid or accrued pursuant to a "minimum royalty provision"; such a payor has the option to treat the advance royalties as deductions in the year they are paid or accrued. A minimum royalty provision was defined as a provision that "requires that a substantially uniform amount of royalties be paid at least annually over the life of the lease." The news release also announced the suspension of Rev. Rul. 74-214. See generally Wendland v. Commissioner,supra,79 T.C. at 378-379; Elkins v. Commissioner,81 T.C. 669, 674-676 (1983). News of the impending announcement by the IRS of the proposed amendment to the regulation apparently caused significant acceleration of the transactions involved in this case. Hayes testified that he received a telephone call in late October from Pomerance's law firm and was cautioned that "if *237 you don't want to have wasted all of your time up to now, you had better see if you can conclude these transactions." The reason for haste was that the IRS announcement indicated that the amended regulation would not apply to royalties required to be paid pursuant to a mineral lease which was binding prior to October 29, 1976. [54] *238 The general partners of Cumberland, accordingly, scrambled to draft and execute the relevant agreements by that date. [55] *239 It is obvious that securing the large advance royalty deduction in 1976 was the primary stimulus for the formation of Cumberland. In December, 1977, respondent issued the final version of the amended regulation, retroactive to October 29, 1976. T.D. 7523, 1978-1 C.B. 192. [56] *240 Respondent at that time also revoked Rev. Rul. 70-20, 1970-1 C.B. 144, and Rev. Rul. 74-214, 1974-1 C.B. 148. See Rev. Rul. 77-489, 1977-2 C.B. 177. The amendment of this regulation has spawned a considerable amount of litigation in this Court, as various taxpayers have attempted to avoid the application of the new provision to coal mining ventures organized in late 1976. We have rejected arguments that respondent's procedure used to amend the regulation violated the Administrative Procedure Act, the legislative reenactment doctrine, or constituted an abuse of discretion. Wendland v. Commissioner,supra;Wing v. Commissioner,81 T.C. 17 (1983). On another occasion we rejected respondent's interpretation *241 of the portion of IR-1687 concerning the retroactivity of the proposed amendment, an issue argued by the parties in this case. In Elkins v. Commissioner,supra, we held that the "party" required tobe bound by a mineral lease or a written contract prior to October 29, 1976 was the partnership and not the individual limited partner. More recently, we held that a limited partnership's obligations under a coal sublease were "illusory" within the meaning of IR-1687, so that the transaction was subject to the amended regulation. Gauntt v. Commissioner,82 T.C. 96 (1984). The issue of whether Cumberland's obligations were "not substantial or were illusory as of October 29" has also been argued in this case. The assumption underlying the litigation of these various procedural issues, both in prior cases and in the instant case, seems to be that a taxpayer who is able to bring his coal venture within the ambit of the old regulation is entitled to a deduction of the advance royalty, even if the payment(s) in question does not constitute an annual minimum royalty. We question the validity of such an assumption. As we have indicated, the old regulation did not appear to endorse the deduction *242 of lump sum advance royalties. See Redhouse v. Commissioner,supra728 F.2d at 1251; Wendland v. Commissioner,supra,79 T.C. at 383-385. Such a deduction plainly is contrary to the well established principle of tax accounting that a prepayment which creates an asset having a useful life that extends substantially beyond the close of the taxable year must be deducted over the years to which the expenses relate. See e.g., Commissioner v. Boylston Market Assn.,131 F.2d 966 (1st Cir. 1942); University Properties, Inc. v. Commissioner,45 T.C. 416 (1966), affd., 378 F.2d 83 (9th Cir. 1967); section 1.461-1(a)(2), Income Tax Regs; Rev. Rul. 77-489, 1977-2 C.B. 177 (noting that amended regulation section 1.612-3(b)(3) requires a result consistent with this principle). It is also possible that a lump sum payment made under circumstances such that its recoupment out of production is, at best, a highly speculative proposition, may be treated as a bonus rather than an advance royalty according to the principle that the substance and not the form of a transaction is determinative for Federal tax purposes. See P. Maxfield, Taxation of Mining Operations, par. 3.03[3][a] (1981); c.f. Fitzsimons v. Commissioner, supra. *243 Although Rev. Rul. 74-214 indicated that a lump sum advance royalty payment would be deductible in the year paid, it is well established that respondent has the power to amend or withdraw a revenue ruling to correct a mistake of law, and that ordinarily such an action, even if applied retroactively, does not constitute an abuse of discretion. Automobile Club of Michigan v. Commissioner,353 U.S. 180 (1957); Wendland v. Commissioner,supra,79 T.C. at 384; Manocchio v. Commissioner,78 T.C. 989, 1000-1001, affd. 710 F.2d 1400 (9th Cir. 1983). Petitioner's purported reliance on Rev. Rul. 74-214 is especially tenuous in light of the fact that the ruling was suspended, and the proposed amendment to the regulation was announced, two months prior to the closing of the subleases and petitioner's entry into Cumberland. Our observation in a prior case is equally pertinent here: "[T]he situation smacks more of petitioners rushing in to take advantage of respondent before he can finalize his amendment to the regulations." Wendland v. Commissioner,supra,79 T.C. at 384-385. The parties in this case have devoted much attention to the issues concerning the applicability of amended section 1.612-3(b)(3), Income Tax Regs., *244 especially the question of whether Cumberland's obligations under the sublease were not substantial or were illusory. See Gauntt v. Commissioner,supra. As the above discussion indicates, we doubt that, even under the old regulation, petitioner would be allowed to deduct the advance royalty in 1976. However, we decline to decide the case on this basis, given our finding (discussed below) that the venture was not engaged in with a bona fide objective of making a profit. In that regard, we think that the above discussion is quite relevant insofar as it illustrates the extent to which the desire to obtain the large advance royalty deduction in 1976 influenced the structure and timing of the transaction herein. With these considerations in mind, we turn to the profit objective issue. It is well established that in order to constitute the carrying on of a trade or business under section 162(a), Cumberland must have entered into the coal venture "in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affd. a Memorandum Opinion of this Court; Brannen v. Commissioner,78 T.C. 471, 501 (1982), *245 affd. 722 F.2d 695 (11th Cir. 1984). While a reasonable expectation of profit is not required, the partnership's profit objective must be bona fide. Box v. Commissioner,80 T.C. 972, 1006 (1983), affd. by order (2d. Cir. January 23, 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. in unpublished orders, [57]734 F.2d 5-9 (3d Cir. 1984); Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion, 702 F.2d 1205 (D.C. Cir. 1983). "Profit" in this context means economic profit, independent of tax savings. Surloff v. Commissioner,supra at 233; Fox v. Commissioner,82 T.C.1001 (1984).
In determining whether a partnership is engaged in a trade or business, the profit objective analysis must be made at the partnership level. Brannen v. Commissioner,supra,78 T.C. at 505; Siegel v. Commissioner,78 T.C. 659, 696-698 (1982); Fox v. Commissioner,80 T.C. at 1006-1007. The intent of the individual limited partners is not determinative of the collective partnership intent, as the limited partners have no control *246 over the activities of the partnership. Rather, the proper focus is generally on the activities and intent of the general partners and promoters. Resnik v. Commissioner,66 T.C. 74 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977); Fox v. Commissioner,80 T.C. at 1007-1008; Surloff v. Commissioner,81 T.C. at 233. Thus, even if petitioner, as the record suggests, may have invested in Cumberland with the hope that it would be profitable, he is not entitled to deduct his loss unless we find that the general partners organized and operated the partnership with a bona fide profit objective. The general partners of Cumberland, Buchanan, Hayes, Koppel and Pritzker, constructed an elaborate network of agreements between various newly-formed entities in order to create the appearance of a bona fide coal mining venture. It becomes apparent, however, upon an examination of the manner in which these agreements were executed, the terms of the sublease agreements, and the economic realities of the proposed coal mining, that Cumberland was not conceived or operated with the dominant objective of making a profit from mining and selling coal. When the paper facade is peeled away, Cumberland is *247 revealed to be a mere tax shelter designed to enrich the general partners and provide sizable tax deductions for the limited partners. None of the general partners had any experience in coal mining, or made any effort to educate themselves in such matters. Buchanan and Hayes, however, did have substantial experience in arranging tax shelters. Buchanan was Koppel's personal tax lawyer, while Hayes (later to become a tax lawyer) had previously worked with Buchanan on tax shelters involving movies. The attempt to depict Koppel, who had a mechanical engineering degree but who made his career in the newspaper business, as the technical expert in Pacific Associates is indicative of the transparency of the venture. That the primary motive behind the formation of Cumberland was to secure attractive tax write-offs is evident from the general partners' initial step -- engaging the services of Pomerance, an attorney recognized as an expert in organizing tax shelters. See Surloff v. Commissioner,81 T.C. at 234. It appears that Pomerance, or other in his firm, served as the intermediary between Pacific Associates, Cotiga, and Gaddy. Despite petitioner's attempt to portray Koppel and Hayes *248 as engaged in an extensive investigation of various coal properties, we are not convinced that any such effort was made. We note that at the time they purportedly conducted this search for coal properties in the Southeast, Koppel was employed fulltime by a newspaper in San Francisco, and Hayes entered law school in Dallas. It is also evident that no actual negotiations occurred between the parties to the subleases. Although Koppel and Hayes represented themselves as responsible for obtaining the coal leases, Koppel never met Thompson, a principal in Cotiga and Black Rock, during 1976, and it is doubtful that Hayes met him prior to the execution of the sublease agreements in late October. Hayes conceded that Pomerance was primarily responsible for determining the terms of the agreements, including the amounts of the advanced royalties. See Fox v. Commissioner,80 T.C. at 1009; Flowers v. Commissioner,80 T.C. 914, 934-935 (1983); Dean v. Commissioner,83 T.C. 56 (1984); Fuchs v. Commissioner,83 T.C. 79 (1984). Obviously there was no arm's length dealing between Crescent and Cumberland, which were both controlled by Buchanan, Hayes, Koppel and Pritzker. The manner in which the sublease *249 agreements between Black Rock, Crescent and Cumberland were executed also belies the existence of any bona fide arm's length dealing. It is obvious that, in the haste to produce agreements prior to October 29 (the date of the IRS announcement of the proposed amended regulation), the attention to the substance of the agreements was somewhat lacking. [58] The percentages of the production royalties specified in the Black Rock-Crescent sublease were inconsistent with those in the Cotiga-Black Rock lease. It is not clear who, if anyone, executed the sublease on behalf of Crescent. [59] The fact that Crescent was incorrectly listed as "Crescent Mining Company" in the sublease suggests that the parties had some difficulty keeping straight the various entities that they created in connection with the venture. It is difficult to explain the disproportionately large advance royalty required to be paid by Cumberland to Crescent other than as a means of inflating the deductions for the limited partners. The rapid escalation *250 of the amounts of rentals and royalties payable under these agreements is astounding.On October 5, Black Rock agreed to lease the coal property from Cotiga, and was required to pay a minimum annual rental of only $4,040. Black Rock then proceeded to sublease the rights to Crescent on October 28 for a lump sum advanced royalty of $2,700,000. Crescent then subleased the rights to Cumberland for a lump-sum advanced royalty of $4,975,000. We find it difficult to take seriously petitioner's argument that these inflated advance royalties, "paid" mostly with nonrecourse notes, were intended by the parties to act as an economic incentive to mine coal. Rather, this appears to be merely another variety of a scheme employing a series of transactions which are intended to inflate the value of the property, by the use of nonrecourse debt, with the sole purpose of obtaining greater tax benefits. See Surloff v. Commissioner,supra;Flowers v. Commissioner,supra;Brannen v. Commissioner;supra; Dean v. Commissioner,supra;Fuchs v. Commissioner,supra.That the advance royalties here were determined "without a true regard for the profitability of the activity" (see Brannen,78 T.C. at 509) is *251 all the more evident from a consideration of the coal reserves and the mining prospects, below. Although it is the activities and intent of the general partners that indicate whether a partnership is engaged in an activity with a bona fide profit objective, our inquiry is not necessarily so confined. A partnership is entitled to rely on the expertise of third parties, and may contractually assign various duties and responsibilities associated with the activity to such parties. Flowers v. Commissioner,80 T.C. at 932. Petitioner relies heavily on the analysis of the coal reserves prepared by Gaddy and the Mine Operating Agreement with B-Rock, in support of his contention that the profitability of the proposed mining was assured. Based on Gaddy's estimate of recoverable reserves, an estimated sales price of $23 per ton, mining costs of $14.25 per ton and yearly production levels as provided in the Mine Operating Agreement, Hayes and Pritzker prepared a ten-year financial projection of Cumberland's operations which showed consistent net income from operations after the first year. While these various assumptions and projections may appear plausible on the surface, and may in fact *252 have persuaded some of the limited partners to invest in Cumberland, we do not think they withstand close scrutiny. Although Gaddy appears to be a qualified mining engineer, there are several facts which call into question the general partners' good faith reliance on his report. In the first place, we note that the report originally was prepared in 1972 for Cotiga, the fee owner of the Law Gap Tract. The general partners made no effort to verify the accuracy of this report. We question whether anyone seriously contemplating a coal mining venture such as this would rely solely on a reserve report prepared four years earlier for another party to the transaction. It should also have been apparent that Gaddy's purported "revision" of the report in 1976 was nothing more than a cosmetic retyping. If Cumberland were seriously interested in a profitable coal mining operation, it would seem that a more thorough inspection of the property would have been undertaken in order to assure that no further mining had been conducted during the four year interval. As it turned out, the Low Gap Tract had been mined to a much greater extent than Gaddy's report indicated, and he subsequently revised *253 his estimate of reserves downwards by three million tons. Gaddy's report was merely an estimate of the recoverable coal reserves on the Low Gap Tract. It did not address the economic feasibility of mining coal from the various seams. The number of tons of recoverable reserves is meaningless without a thorough study of the methods that would be required to mine the coal, the costs of such mining, and the prospects for selling the final product. As we observed in a prior case: Operating a coal mine profitably requires not only minable seams of coal but also miners and machinery to mine and remove the coal from the mine or the face, water and electricity, access roads to and from the entries, tipples and cleaning plants that are nearby and are capable of handling the coal, good roads or railroads from the tipple or cleaning plant to the point of distribution, and customers who will buy the coal at a price that will yield a profit. It must also be recognized that there may be strikes, mine closings because of weather, safety hazards, or other reasons, and that there may be variations in the costs of mining and transporting the coal, and the selling price of coal. [Surloff v. Commissioner,81 T.C. at 235.] *254 There is no evidence that the general partners prepared any study of the economic feasibility of mining coal from the Low Gap Tract. Rather, they based their projections of Cumberland's profitability on a series of assumptions derived from various agreements that lacked economic substance. As we have indicated, Gaddy's report on the coal reserves ultimately proved to be seriously deficient. His estimate of 6,613,000 tons included several seams that had been either wholly or partially mined. Respondent's expert, Hooper, estimated the recoverable reserves to be 3,355,000 tons. When adjusted to take into account the undisclosed exhaustion of the Upper Cedar Grove seam, Hooper's estimate falls to 2,490,000 tons. We do not attempt to resolve the differences between these reports, which are based on different assumptions regarding the thickness of the coal seams, the number of "coal acres" contained in each seam, and the percentage of coal that could be recovered by various mining methods. Although Gaddy appears to be a qualified mining engineer, the significant deficiencies in the report, as well as the manner in which the report was "revised" in 1976, weaken the credibility of his report *255 and testimony. On the other hand, Hooper's report does not adequately explain the basis for certain assumptions, and he was unable to testify at trial. However, we think that the arguments over the "correct" estimate of coal reserves simply divert attention away from the more fundamental question of whether, regardless of the amount of recoverable reserves, Cumberland had any bona fide intention of mining and selling coal. Petitioner contends that it was reasonable to rely on Gaddy's report in 1976, and that the more than six million tons of coal reserves estimated to exist on the tract were more than sufficient to recoup the advance royalty at a selling price of $23 per ton. [60] According to petitioner, this satisfies the "requirement" of Rev. Rul. 74-214, that the coal reserves must be "substantially in excess" of the amount required to recoup the advance royalty. Once again, we think this argument strays from the relevant line of inquiry. We have already indicated that this entire venture appears to have been planned to capitalize on an apparently erroneous interpretation in Rev. Rul. 74-214 of the old regulation governing the deduction of advanced royalties. We think Gaddy's *256 report on the coal reserves was accepted, without any further inquiries by the general partners (or Pomerance), precisely because it meshed so well with the paper facade designed to create the appearance of a bona fide mining venture. The significant issue is not the amount of reserves that may have existed on the Low Gap Tract, but whether Cumberland had the intention and capability to create a profitable mining operation. It does not require too much analysis to come to the conclusion that there was little substance to any of these agreements. It is not clear how the projected $23 per ton sales price for the coal was derived. The testimony was inconsistent on this point; Hayes testified that it was determined by Gaddy and Pomerance's law firm, while the Private Offering Memorandum indicates that this price was confirmed by Black Rock Sales. It was not explained why a New York law firm specializing in tax shelters would be competent to render an opinion on the price of coal in Mingo County, although this explanation of the origin of the sales *257 price is consistent with Pomerance's apparent control over the terms of the various agreements. The important fact regarding the projected sale of coal, however, is that neither Cumberland, Pomerance or Black Rock Sales ever obtained an output contract for the production from the mine. [61] This is not ordinarily a step to be overlooked in planning a coal mining operation. See Surloff,81 T.C. at 235. There is no evidence that B-Rock mining, which was apparently formed contemporaneously with the agreements herein, was anything more than a paper corporation designed to add a veneer of economic reality to Cumberland. [62] There is no reference in the record to any employees of B-Rock, other than Thompson, Spirer and Wolford. Thompson and Spirer also controlled Black Rock and Black Rock Sales. Although petitioner introduced into evidence photographs of mining equipment, there is no evidence other than Gaddy's evasive testimony that this equipment was owned by B-Rock.Gaddy, in fact, contradicted Koppel's assertion that all of the photographs *258 were taken at the Alma site. There is also no evidence that B-Rock was sufficiently capitalized to conduct mining. [63] Most significantly, however, neither Thompson or Spirer -- who purportedly were in charge of the mining operation and presumably would have the most knowledge of the salient facts surrounding the venture -- testified at trial. Petitioner relies almost entirely on the testimony of Gaddy, who conceded that he never managed the operation and in fact never entered the mine. Black Rock Sales, on which Cumberland purportedly relied, pursuant to the Coal Brokerage Agreement, to arrange the sale of its coal, was an equally evanescent *259 entity. Of it we are told, in the Private Offering Memorandum, only that it was a newly formed partnership and that neither of its principals had any experience in the brokerage of coal. In their haste to finalize the various agreements prior to the end of the year, the parties neglected to fill in the blank in the Coal Brokerage Agreement which was reserved for the percentage commission that Black Rock Sales was to earn in this capacity. A similar oversight was the fact that the production levels specified in the Mine Operating Agreement did not match those specified in the Crescent-Cumberland sublease.Such inattention to important details permeated virtually all of the agreements, and is indicative of the unbusinesslike and hurried fashion in which they were executed. See Fox v. Commissioner,80 T.C. at 1012. Another indication that Cumberland lacked a bona fide profit objective is the fact that it was seriously undercapitalized. See Surloff v. Commissioner,81 T.C. at 235, 237. After paying the advance royalty and organizational expenses, the partnership retained only $40,300 as working capital. Obviously, if B-Rock failed to meet its obligations under the Mine Operating Agreement, *260 Cumberland itself was in no position to undertake mining. This risk was noted in the Private Placement Memorandum. Petitioner attempts to dismiss this problem by noting that B-Rock was required by the agreement to maintain working capital of $200,000. Aside from the circularity of this reasoning, there is no evidence, as we have discussed, that B-Rock was so capitalized or in fact had any substance beyond the Mine Operating Agreement. There is also no evidence concerning the disposition of the $1,200,000 paid to Black Rock as the cash portion of the advance royalty. Of the $775,000 retained by Crescent, most was used for the Payment of finder's fees to investment advisors, legal fees to Pomerance's law firm, Federal income taxes, and compensation and expense reimbursements to Buchanan, Hayes, Koppel and Pritzker. None of those funds were used to finance the coal mining. The most telling evidence of the actual prospects for the coal mining is that only about 14,000 tons of coal were mined from the Alma seam before operations were terminated and the equipment was moved from the site. None of this coal was sold. We are not persuaded by petitioner's argument that, but for unanticipated *261 events such as floods and miners' strikes, the mining would have been successful. This appears to be a convenient way to circumvent the fact that none of the parties to these transactions seriously contemplated the full scale mining of coal. Moreover, any reasonable plan to mine coal would anticipate such difficulties, which appear to be normal risks associated with coal ventures. [64]
As we have indicated in prior cases, the existence of large nonrecourse notes in circumstances where it is unlikely that the notes will be paid is itself an indication that the primary objective of the partnership was to provide tax deductions rather than earn an economic profit. Surloff v. Commissioner,81 T.C. at 237-235; Flowers v. Commissioner,80 T.C. at 937. The nonrecourse notes used to "pay" the advance royalties under these subleases clearly had no economic substance, and were used solely to accelerate and inflate the deductions of the limited partners.[65] *263 Surloff v. Commissioner,81 T.C. at 237-238. As our discussion above indicates, these lumpsum advance royalties bear little resemblance to the annual minimum royalty provisions *262 which serve a legitimate business purpose in bona fide mineral-leasing transactions. Our observation in a prior case is pertinent to these transactions: It would have been foolhardy for any lessee to actually obligate itself, in advance of even any preparation to mine, to pay a tonnage royalty on every ton of coal that the consultants estimated might be mined from the property. It is obvious that the only purpose for the advanced royalty notes was to support a deduction for advanced royalties paid or accrued for tax purposes. Nothing was ever paid on the notes and it was not intended in reality that anything would be paid on them. The tonnage royalties would have been the source of any payments for the coal mined, not the notes. No interest was paid on the notes. The notes were window dressing, and were not payments of royalties. [Surloff v. Commissioner,81 T.C. at 237-238] In summary, we think it is clear that these various agreements were nothing more than a paper facade, and that the general partners had no intention of ever conducting a profitable coal mining operation. While the parties went to great lengths to form various entities and link them together with a chain of agreements creating the appearance of bona fide transactions, there is little substance *264 beneath the surface. No one seriously analyzed the validity of the various assumptions regarding levels of production, mining costs, and sales price of coal, upon which the financial projections were based. The multitude of "risk factors" ominously outlined in the Private Placement Memorandum seem to have been ignored in preparing the optimistic forecasts of profitability. See Flowers v. Commissioner,80 T.C. at 936. We cannot accept the general partners' purported reliance on newly created entities such as B-Rock and Black Rock Sales as a substitute for a bona fide effort to mine coal. "At some point, naivete becomes a purposeful refusal to analyse the facts, perhaps due to the expectation that the tax benefits, alone, will justify the investment." Flowers v. Commissioner,80 T.C. at 940. We find little in this venture to justify the allowance of any deduction under section 162. Having concluded that the partnership was not engaged in the activity with the requisite profit objective, we need not consider the alternative grounds for the disallowance of these deductions.Accordingly, Decision will be entered for the respondent.
Footnotes
1. Pamela Tallal is not a party to this proceeding as a result of this Court's ruling that the notice of deficiency was not timely mailed to her. Tallal v. Commissioner,77 T.C. 1291↩ (1981).
2. This date was stipulated by the parties as the date of petitioner's entry into Cumberland. However, the amendment to the partnership agreement reflecting the admission of the new limited partners is dated December 27, 1976. Petitioner's check for $30,000 payable to The Cumberland Group was dated "11-28-76."↩
3. Wagner withdraw from the partnership on December 27, 1976, at which time the certificate of limited partnership was amended to reflect the addition of new limited partners, including petitioner.↩
4. Buchanan is also one of the attorneys representing the petitioner in this proceeding.↩
5. In the Private Placement Memorandum describing Cumberland, Buchanan is identified as the general partner in a limited partnership owning rights to a movie entitled "Seven Beauties." Hayes is described as having been "engaged in finance and tax plainning since 1970."↩
6. The Cotiga-Black Rock lease described the coal property as a 404 acre tract. However, both reports of the parties' expert witnesses, as well as the Private Placement Memorandum of Cumberland, describe the tract as 464 acres. There is no explanation for this discrepancy. The record as a whole indicates that 464 is the correct figure. ↩
7. Although incorporated in Delaware, Cotiga apparently was operated out of Pennsylvania.↩
8. For each ton of coal removed by deep-mining methods Black Rock was required to pay Cotiga the greater of 7 percent of the net selling price of the coal F.O.B. the mine or $ .50 per ton; for strip-mining, the greater of eight percent or $ .75 per ton; and for auger-mining, the greater of nine percent or $ .75 per ton.↩
9. On October 28, 1976, the Lease was amended to include in this sublease provision a specific reference to The Cumberland Group.↩
10. Hayes testified that he was not told specifically what the IRS was expected to announce. On October 29, 1976 the IRS announced proposed regulations under sec. 612 which would prevent the deduction of certain lump-sum advanced royalties unless the mineral product with respect to which the royalty was paid was actually sold during the taxable year. News Release IR-1687, October 29, 1976. Final regulations were adopted in December, 1977, retroactive (with certain exceptions) to October 29, 1976. Sec. 1.612-3(b)(3), Income Tax Regs, as amended by T.D. 7523, 1978-1 C.B. 192. See P. 43. infra.↩
11. This is the terminology used in the agreement. The same terminology was used in the sublease agreement between Crescent and Cumberland, infra. By using this terminology, we do not imply any legal conclusion as to the treatment of these items under sec. 1.612-3(b)(3), Income Tax Regs↩, or any other provision of the Code.
12. The same Notary Public notarized the amendment of the lease between Black Rock and Cotiga, dated October 28, 1976, which was signed by Thompson for both Black Rock and Cotiga. ↩
13. he signature line on the document incorrectly identifies the lessee as "Crescent Mining Company" rather than "Crescent Coal Company." An illegible signature appears over the handwritten title "atty in fact."↩
14. There is no explanation for the greater specificity of the Crescent-Cumberland sublease. The Cotiga-Black Rock lease and the Black Rock-Crescent sublease contained no reference to these specific coal seams. While on its face this appears to be a restriction on Cumberland's mining rights, the record as a whole indicates that these six seams comprise all of the coal reserves on the Low Gap Tract, and that Cumberland received all of the coal rights that Crescent received from Black Rock.↩
15. The provision of the agreement concerning the payment of the advanced royalty was worded in the future tense. The agreement reads in pertinent part: 2. Consideration for Sublease
* * * (b) [Cumberland] will be obligated, upon execution of this Sublease, to pay [Crescent] an advanced or minimum royalty of $4,975,000. . .↩
16. The sublease stated that the Original Sublease between Crescent and Black Rock was "annexed hereto and made a part hereof." However, both agreements are dated October 28, 1976 and were executed in different states (California and Pennsylvania).↩
17. The coal rights comprised the bulk of Cumberland's assets; after payment of the cash portion of the advance royalty and organization expenses, the partnership retained only $40,300 in cash as operating capital. The record does not support petitioner's contention that under the mining agreement, infra,↩ it received an "equity interest" in $700,000 worth of mining equipment.
18. The original 1972 report was the report referred to in the sublease provision entitled "Conditions Precedent to Consummation of Sublease," supra.↩
19. B-Rock Mining Company should not be confused with Black Rock Coal Company, the original sublessor, which was also controlled by Thompson and Spirer. However, it is not clear that the separate identities of these affiliated entities were strictly observed. Petitioner's brief implies that the cash received by Black Rock from the royalty under the original sublease may have been intended in part to finance B-Rock's mining activities.
20. This is less than the level of production specified in section 3(a) of the Sublease, supra.↩ The production rates required by the Sublease would produce 90,000 tons in 1978, 230,000 tons in 1979, and 240,000 tons in 1980.
21. There is no reference in the record to any "original" private placement memorandum. ↩
22. Petitioner was allowed to purchase a 3/5 share for his $30,000 capital contribution. ↩
22. No such opinion of the law firm was submitted into evidence.↩
24. The section of the prospectus concerning the income tax aspects of the venture contained a more detailed discussion of the treatment of the advanced royalty.↩
25. The production rates and the direct mining costs ($14.25 per ton) were taken from the Mine Operating Agreement. The projection also allowed one dollar per ton each for "contingent mining cost," general and accounting expenses, and general partner's fee. Interest on the promissory note was also included. It is not completely clear how the sales price of $23 per ton was derived. Hayes testified that this was determined by consulting with Gaddy and the New York law firm, but the prospectus states that Black Rock Sales advised Cumberland that this was a competitive price. Gaddy testified that the sales price in Mingo County at that time was from $25-29 per ton on a shipped-ton basis. 26. This figure is derived as follows: The capital (cash) contribution of $2,000,000 produces a tax deduction (due to the note) of $4,975,000, which yields $2,412,500 of cash to the limited partners (assuming a 50 percent tax rate). (The "cash flow" produced by the deduction is less than 50 percent of $4,975,000 because part of the losses were allocated to the general partners). ↩
27. These projections were based on coal production of 80,000 tons in 1977, 175,000 tons in 1978, and 200,000 tons in 1979 and each year thereafter, and a constant $23 per ton sales price. The projection also assumed that the mining agreement with B-Rock would be extended, on the same terms, beyond its three year term.↩
28. The time at which distributions to the limited partners equals their capital contribution.↩
29. Pacific Associates also contributed $50,000 for one unit of Cumberland as a limited partner.↩
30. Under the Mine Operating Agreement, B-Rock was required to maintain working capital of $200,000. It is not clear whether it was so capitalized. The Private Offering Memorandum states that Crescent agreed to make loans of up to $200,000 to Cumberland, but there is no provision to this effect in the Sublease agreement.↩
31. Black Rock Sales purported to be an entity separate from Black Rock Coal Company and B-Rock Mining Company, also controlled by Thompson and Spirer. It is not clear when Black Rock Sales was organized. The Private Placement Memorandum described it as "newly formed" with "no previous experience in the brokerage of coal." 32. The space reserved for the percentage figure was left blank in the agreement.↩
33. Hayes testified that he received $10,000 in travel reimbursements and $12,000 compensation, and that Crescent spent a total of $40,000 in fees to the officers and $30,000 for expense reimbursements. Koppel testified he received no payments from Crescent in 1976, 1977 or 1978. The Private Offering Memorandum estimated that Crescent would incur approximately $75,000 in expense reimbursements. ↩
34. Some of these funds may have been used to pay legal expenses incurred in 1980 or 1981 when Cumberland sued various parties connected with the coal venture.↩
35. Petitioner introduced into evidence photographs of mining equipment, purportedly taken at the Alma mine opening. The equipment pictured was not installed or positioned so as to conduct mining. Gaddy testified that some of the photographs could not have been taken at the Alma opening, based on the width of the coal seam. He identified others that were taken at the Alma mine. Koppel testified that the photographs were taken at the Alma site in 1978. ↩
36. Gaddy's testimony was somewhat evasive on this point. When asked whether Thompson told him that he owned the equipment, he replied "That is my understanding of our conversation."↩
37. It does not appear that any coal was ever sold by Cumberland. On its partnership returns for 1976-1980, Cumberland reported only minor amounts of interest income.↩
38. The original report was actually written by Howard Egan, an employee of Gaddy.↩
39. Gaddy did not manage the mining of the Alma seam. He was unaware of how much coal was actually mined, as he had not been in the mine or seen any production records. ↩
40. This is somewhat inconsistent with Gaddy's testimony that the equipment he saw at the mine was capable of producing 18,000 tons per month on a two-shift basis.↩
41. Gaddy testified that mining techniques developed after the report was prepared made certain mountaintop coal seams more easily mineable, with a higher recovery percentage.
42. It appears that the additional mining was discovered in 1978, when Gaddy obtained certain mining maps which he had not seen when he prepared the original report. It is not clear when Gaddy revised his estimates.↩
43. Hooper was unable to testify during the proceeding. Petitioner's counsel was afforded an opportunity to cross examine Hooper at a later time, but declined to do so. ↩
44. Hooper's report refers to the "Bee Rock," rather than the "B-Rock," mine. The photographs of the Alma mine site also show a sign above the mine opening displaying the words "Bee Rock" above a picture of what appears to be a bumble bee. There is no explanation for this discrepancy.
45. An "interval" is the distance between two seams of coal.Hooper stated that an interval of fifteen feet was insufficient to allow mining of both seams. Gaddy testified that intervals of eight feet have been mined in Mingo County.↩
x. Thousands of tons. ↩
y. Determined to be too thin to mine. ↩
z. Coalburg "A" and Lower Coalburg seams. Gaddy's report did not distinguish among any separate seams in the Coalburg bed.↩
46. This conclusion is based on Hooper's estimate of 925,000 tons of recoverable reserves in the Alma seam. ↩
47. Gaddy testified that his report was not an economic study of the feasibility of mining coal on the Low Gap Tract. ↩
48. Gaddy testified that "we had some general discussions about eventually mining some of the upper seams."↩
49. Hayes testified that Cumberland was advised to "sue everyone" because of potential problems with the statute of limitations. The suit against the law firm alleged misrepresentation and conflict of interest. Hayes could not remember the charges against Gaddy, but said it might have involved a "discrepancy" in the report.
50. All section references are to the Internal Revenue Code of 1954, as amended, and in effect in 1976. ↩
51. After the trial in this case was concluded, respondent filed a motion requesting that we sever, for the purposes of briefing and decision, the issue of whether sec. 1.612-3(b)(3), Income Tax Regs, as amended by T.D. 7523, 1978-1 C.B. 192↩, applies to prevent the deduction in 1976 of the advance royalty. We denied respondent's motion.
52. Section 612 and the regulations promulgated pursuant thereto generally concern the basis for which cost depletion is allowed for various economic interests in minerals in place. However, sec. 1.612-3(b) (prior to the 1977 amendment) and sec. 1.612-3(b)(3) (as amended by T.D. 7523, 1978-1 C.B. 192↩) also provide rules concerning the deduction of advance royalties.
53. We note that the author of this article, Martin Pomerance, was the attorney primarily responsible for structuring the transactions herein.↩
54. IR-1687 provided in pertinent part: Under the proposed amendment, the treatment of advanced royalties would be revised, effective October 29, 1976, unless the advanced royalties are required to be paid pursuant to a mineral lease which (i) was binding prior to that date upon the party who in fact pays or accrues such royalties, or (ii) was required, pursuant to a written contract, to be executed by the party who in fact pays or accrues such royalties, provided that such party establishes, to the satisfaction of the Secretary or his delegate, that under all the facts and circumstances the contract was binding upon such party prior to that date. For purposes of clause (ii) above, a contract will in no event be considered to be binding upon such party if the obligations imposed on such party prior to October 29, 1976 were not substantial or were illusory. 55. The hurried manner in which the sublease agreements were executed is evident from several facts: None of the principals of Crescent appear to have executed the Original Sublease; both the Sublease and the Original Sublease were dated October 28, and were executed separately in Pennsylvania and California, even though the Sublease purportedly annexed a copy of the Original Sublease; the Original Sublease incorrectly refers to "Crescent Mining Company" rather than "Crescent Coal Company; and the royalty provisions initially included in the Original Sublease were inconsistent with those in the Lease, thus requiring a later amendment. Furthermore, although Hayes and Koppel represented themselves as the persons responsible for locating the coal property and negotiating the agreements, it appears that neither met Thompson, a principal in Cotiga and Black Rock, prior to the time the agreements were executed. It is reasonable to infer from these facts and the record as a whole that most of the "negotiations" probably occurred between Pomerance, Thompson and Spirer, who had had prior business dealings, and that Pacific Associates relied entirely on Pomerance to structure the transactions and draft the agreements, with a view towards making the best possible case for a deduction of the advance royalties. Hayes, in fact, conceded that the terms of the sublease agreements were determined primarily by Pomerance, which confirms the inference that no meaningful negotiations between the parties to the agreements occurred.
56. The relevant portion of the final regulation, sec. 1.612-3(b)(3), reads as follows: * * * (3) The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. . . However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. . . For the purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. * * *
57. Sub nom. Krasta v. Commissioner,Hook v. Commissioner,Rosenblatt v. Commissioner,Leffel v. Commissioner, and Zemel v. Commissioner.↩
58. See note 55, supra.↩
59. Both the Black Rock-Crescent sublease and the Crescent-Cumberland sublease were dated Oct. 28, and executed in Pennsylvania and California, respectively.↩
60. Petitioner also argues that even using Hooper's lower estimate of 3,355,000 tons, the coal reserves are sufficient to recoup the royalty.↩
61. We note that the original Mine Operating Agreement provided for delivery to a U.S. steel plant in Thacker. This provision was later stricken.↩
62. There appears to be some confusion about the correct name of this corporation; it is referred to in documents as "B-Rock", but photographs from the mining site reveal a sign labelled "Bee Rock". See note 44, supra.↩
63. Petitioners imply on brief that the royalty payment to Black Rock was intended to finance the mining operations, but the relationship between these entities was never clarified. Contrary to petitioner's contention on brief, there is no provision in the Mine Operating Agreement requiring B-Rock to invest $700,000 in mining equipment.↩
64. These risks were discussed in the Private Placement Memorandum.↩
65. A separate issue in this case is whether the $3,000,000 nonrecourse note paid by Cumberland to Crescent should be recognized for tax purposes. Respondent makes several arguments on this issue. Because we have found that the partnership did not engage in the coal mining with a bona fide profit objective, we do not specifically address this issue. We observe, however, that these issues are interrelated; the absence of a bona fide business purpose for this note contributes to our finding that Cumberland lacked the requisite profit objective. Were we to separately address the issue, we doubt that we would recognize this note as a bona fide liability of the partnership, given its highly speculative or contingent nature. See CRC Corp. v. Commissioner,693 F.2d 281 (3d Cir. 1982), revg. and remanding on other grounds Brountas v. Commissioner,73 T.C. 491 (1979); Brountas v. Commissioner,692 F.2d 152, 157 (1st Cir. 1982), vacating and remanding on other grounds 73 T.C. 491 (1979); Gibson Products Co. v. United States,637 F.2d 1041 (5th Cir. 1981); Fox v. Commissioner,80 T.C. 972, 1020-1022↩ (1983).