FREDERIC ENTERLINE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; VIRGINIA G. ENTERLINE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Enterline v. Commissioner
Docket Nos. 8101-78; 7438-78.
United States Tax Court
T.C. Memo 1980-200; 1980 Tax Ct. Memo LEXIS 384; 40 T.C.M. (CCH) 454; T.C.M. (RIA) 80200; June 12, 1980, Filed *384 During the years 1971 through 1975 petitioner Frederic Enterline misappropriated funds from his employer. Petitioners failed to report to the misappropriated funds on their joint income tax returns. Held, petitioner Frederic Enterline is liable for the addition to tax under sec. 6653(b), I.R.C. 1954. Held further, petitioner Virginia Enterline qualifies as an innocent spouse. Sec. 6013(e). William G. Boyle, for petitioner Fredric Enterline and Lawrence P. Galie, for petitioner Virginia Enterline.
Michael A. Yost, Jr., for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In a joint statutory notice of deficiency dated April 12, 1978 respondent determined deficiencies in income taxes and additions thereto as follows: Addition to Tax
Year
Deficiency
Sec. 6653(b)
Total
1971
$11,012
$ 5,506
$16,518
1972
18,548
9,274
27,822
1973
30,147
15,074
45,221
1974
42,424
21,212
63,636
1975
26,170
13,085
39,255
These cases were consolidated for the purposes of trial, briefing and opinion. After concessions the issues remaining are: (1) whether petitioner Frederic Enterline is liable for the addition to tax imposed under the provisions of section 6653(b), I.R.C. 1954 for each of the taxable years 1971 through 1975 as a result of his failure to report as income funds misappropriated by him from his employer, and (2) whether petitioner Virginia G. Enterline is entitled, under the provisions of section *386 6013(e), to be relieved of the liability for the deficiencies in income taxes on her and her husband's joint returns for the taxable years 1971 through 1975. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. At the time of the filing of their respective petitions, petitioners Fredric Enterline and Virginia G. Enterline, were legal residents of Pittsburgh, Pennsylvania. Petitioners have been married since August 1954 and have four children. For the taxable years 1971 through 1975, petitioners timely filed joint Federal income tax returns. In 1957 Mr. Enterline began working for the stock brokerage firm of Hulme, Applegate & Humphrey, Inc. (hereinafter HAH). The firm was located in Pittsburgh, Pennsylvania. It was a member of the Philadelphia-Baltimore-Washington stock exchange and the National Association of Securities Dealers and was registered with the Securities and Exchange Commission. HAH was audited by these regulatory organizations and C.P.A. firms between five and nine times per year. Mr. Enterline was a hard worker, often *387 working 7 days a week and 12 or more hours per day. As a result of his efforts he was promoted to the position of treasurer in November 1970. As part of his duties, he was responsible for making deposits and disbursements and reconciling monthly bank statements of HAH. He was also responsible for co-signing checks, making certain entries to the various ledgers and journals of HAH, and preparing certain financial statements and reports which were filed with regulatory bodies such as the U.S. Securities and Exchange Commission. While employed with HAH, Mr. Enterline on his own initiative would assist clients in determining the tax consequences of their stock transactions and furnish them with tax forms. Despite these responsibilities and long work weeks Mr. Enterline's salary during the years in issue only ranged between $14,800 and $16,710. During the course of his employment, Mr. Enterline misappropriated a substantial amount of funds from HAH. His misappropriation began in 1963 and continued until November of 1975, at which time the misappropriation was admitted by him during an audit conducted by John M. Anderson & Co., C.P.A. The total funds misappropriated during such *388 period amount to $462,668.12. As part of his scheme, he employed the following artifices: (a) purchased securities at HAH but did not pay for certain of such purchases and did not make entries to the books of the firm accurately to reflect the transactions; (b) drew and cosigned corporate checks of HAH payable to himself and his wife and did not properly record these checks on the books of HAH; (c) converted monies tendered by HAH customers for payment in their accounts and in connection therewith made false entries or caused false entries to be made on the records of HAH indicating that such funds had been credited to HAH customer accounts (however no customers suffered any actual loss); (d) failed to execute purchases of certain 30-day short-term notes and send confirmations to customers from HAH reflecting that purchases had been made when, in fact, no such purchases were made at that time; (e) executed unauthorized loans with banks and deposited the funds into HAH's operating account at Pittsburgh National Bank to compensate for the declining balance on such account that resulted from his activity. In connection with such loans, Frederic Enterline paid interest on the *389 loans and failed to record certain such payments on the books of HAH; and (f) drew checks on the HAH checking account at Pittsburgh National Bank payable to Union National Bank account of HAH for the purpose of paying interest on overdrafts in said Union National Bank account caused by him. With respect to the misappropriated funds obtained under scheme (b) above, Mr. Enterline would sign his wife's name and deposit the checks. Mrs. Enterline never saw the checks and was unaware of the deposits. Following the discovery of his misappropriation, Mr. Enterline resigned as treasurer of HAH and ceased his activity as cashier and back office manager on or about November 5, 1975. He was, however, retained by HAH thereafter strictly to assist John M. Anderson & Co. in verifying the books and ledgers of HAH. A criminal complaint was filed against Frederic Enterline in the District Court of Western Pennsylvania for violations stemming from his embezzlement scheme against HAH. On April 25, 1978, he pled guilty. He was subsequently sentenced to a 2-year term of imprisonment beginning May 22, 1978. The joint stock account of petitioners was liquidated in December of 1975. The proceeds *390 were delivered by Mr. Enterline to his attorney where they were subsequently used to provide normal support for Mrs. Enterline and the four children. During the period 1975 and onward Mr. Enterline borrowed approximately $15,000 from his wife's parents and $7,000 from his father. This money was used to provide support for his family. After giving due consideration for misappropriated funds returned to HAH and all other offsets and deductions, Mr. Enterline misappropriated and failed to report on his and his wife's joint tax returns for the years 1971 through 1975 the following amounts: Year
Unreported Income
1971
$36,000
1972
50,000
1973
52,296
1974
50,066
1975
29,674
Mr. Enterline prepared each of his and his wife's joint income tax returns for the years in issue. To assist in the preparation of the returns, Mr. Enterline received in the mail from the Internal Revenue Service for each of the years 1971 through 1975 a tax package containing a blank income tax return, Schedules A and B, and instructions for completing the tax return. The index for the tax package listed a section entitled "Income to be Reported." This section of the tax package included *391 embezzled or other illegal income among the categories of income that must be reported. Mr. Enterline referred to the instructions in each of the packages in completing the joint income tax returns for each of the years in issue. In addition to the form booklet Mr. Enterline obtained a tax instructional booklet published by the Internal Revenue Service during the years in issue. These booklets provided instructions for filling out the Form 1040 and the schedules included therein. The index for the publication lists a section entitled "Income to be Reported." This respective section of each of the publications included embezzled or other illegal income among the categories of income that had to be reported. Mr. Enterline used these publications in completing the joint income tax returns for each of the years in issue. On each of the returns the following amounts of adjusted gross income were reported: Year
Adjusted Gross Income
1971
$14,012.06
1972
17,119.96
1973
13,450.16
1974
15,240.84
1975
18,763.45
Mrs. Enterline signed each of the joint returns. However, at the time she signed the returns, they were usually blank. Because Mr. Enterline usually *392 worked up the tax returns and typed them at the office after obtaining his wife's signature, Mrs. Enterline was unaware of the amounts reported for adjusted gross income, taxable income, and tax. Further, even if Mrs. Enterline had had an opportunity to review the tax returns, because she was unaware of her husband's salary and the success or lack thereof of his investments, she could not have determined the accurate income figure to be reported on the returns. The expenditures made by petitioners during the years 1971 through 1975 substantially exceeded their reported adjusted gross income. The following expenditures were made by them for the below-listed items for the years at issue: Years
Items
1971
1972
1973
1974
1975
Dept. store &
clothing
$ 10,100
$ 11,349
$ 8,771
$ 6,261
$ 6,275
Insurance
3,000
3,549
3,298
3,899
3,999
Entertainment
644
597
551
1,282
742
Television set
625
Repairs and improve-
ments to residence
1,450
4,700
921
1,158
1,696
Veterinary Hospital
165
369
McGee Cadillac
9,813
Musical instruments
for children
820
532
Furniture and fixtures
for residence
4,333
3,172
4,420
9,743
195
Mortgage and utilities
6,691
6,646
7,633
7,868
8,566
Installment payments
5,800
5,915
1,920
5,506
1,259
Medical
1,865
1,957
3,186
3,263
4,740
Donations
383
539
786
735
660
Taxes
640
930
911
921
1,046
Food
6,000
6,000
7,000
8,000
7,000
Auto Repairs and
gasoline
500
500
1,882
2,025
1,898
Miscellaneous
1,600
1,600
1,000
1,000
1,000
Travel
1,672
1,244
1,566
1,483
Shadyside Academy
600
McKean Oldsmobile
6,973
Victor Comptometer
780
Purchase of Securities
(excess payment over
proceeds of securi-
ties sold during yr)
9,049
11,437
6,304
6,004
Tuition
989
PNB interest
402
Totals
$ 63,478
$69,817
$49,827
$60,220
$40,961
*393 These expenditures represent in part the purchase in 1971 of a new Cadillac for a cash payment of $9,813 plus a trade-in of their old car. The car was put in the name of Mrs. Enterline on the advice of their insurance agent. Mrs. Enterline was primarily responsible for buying food and clothing for the family. The furniture purchases represent petitioners' redecoration of a different room of their home each year. Both petitioners participated in the selection of the furniture. However, almost all the family expenses were paid by Mr. Enterline. During the years in issue petitioners also bought two vacation lots, one at "Bear Rocks" and one at "Laurel Village." Each of the lots cost about $3,800. The lot at "Bear Rocks" was titled in the name of Virginia Enterline. She was aware of the purchase of both of these lots. Petitioners took two vacations during the 5 years in issue, one to Spain and the other to Copenhagen. The trip to Spain was taken by petitioners and their daughter. The reason for the trip was their daughter's membership in the International Twirling Teacher's Institute for baton twirlers. The daughter went overseas to teach and petitioners accompanied her *394 to serve as chaperons. Both trips were tour group charter flights. The cost of the trip to Spain for petitioners and their daughter was $900 and the cost of the trip to Copenhagen was approximately $800. These amounts represent their round-trip air and hotel cost. In 1969 petitioners purchased a new home at a cost of $58,000. The purchase was financed by a down payment of approximately $14,000 and a mortgage for the balance. Of the $14,000 down payment $11,000 represents the profit from the sale of petitioners' previous residence. During the years 1971 through 1975 petitioners' monthly mortgage payment was between $423 and $500. The increase in the mortgage payment was attributable to changes in the property tax rate. Mr. Enterline was solely responsible for the financial matters of the family.He informed his wife on how much she had to spend and that financial matters were his business, not hers. During most of the years in issue petitioners had two checking accounts--one at the Pittsburgh National Bank (PNB) and the other at the Mellon Bank (MB). Mr. Enterline kept his records and checkbooks in his basement office. He never sent his wife down to the basement to get *395 a check, nor did he allow her to read the statements when they arrived. Mrs. Enterline could not write a check without obtaining prior authorization from her husband. The normal procedure for Mrs. Enterline to write a check was to inform her husband of the need in advance so that he could prepare the check. Mr. Enterline would usually give her a check from the PNB account, the account was used primarily for the family expenditures. The misappropriated funds were generally deposited in the MB account, an account in which Mrs. Enterline probably did not write more than two or three checks a month. During 1974 and 1975 petitioners borrowed $15,000 from the PNB and placed the loan proceeds into the PNB account. In 1969 petitioners opened separate custodian accounts for each of their four children.Mrs. Enterline was the trustee of all of these accounts and signed all the necessary documents. However, Mrs. Enterline was only advised of the accounts due to her husband's need for her signature on the pertinent documents. She never received statements of the accounts and she did not participate in making any investments or purchases of stock. OPINION Issue 1: Fraud--Mr. Enterline
*396 The first issue is whether any of the underpayment of tax in 1971 through 1975 was due to fraud within the meaning of section 6653(b). Fraud is an actual intentional wrongdoing; the intent required is the specific purpose to evade a tax believed to be owing. McGee v. Commissioner,61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. den. 424 U.S. 967 (1976). In order to prove an underpayment is due to fraud, respondent must prove, by clear and convincing evidence, that petitioner had the specific purpose and intent to evade a tax believed to be owing and the underpayment of tax must be due to, or caused by, the purpose and intent to evade tax. Section 7454(a); Rule 142, Tax Court Rules of Practice and Procedure. The existence of fraudulent underpayment can be established by circumstantial evidence and reasonable inferences drawn from the record. Stoltzfus v. United States,398 F.2d 1002, 1005 (3d Cir. 1968). However, the mere suspicion of fraud is insufficient and it will not be imputed or presumed. Carter v. Campbell,264 F.2d 930, 935 (5th Cir. 1959). The parties have stipulated *397 that petitioners failed to report the following amounts of income: Year
Income
1971
$36,000
1972
50,000
1973
52,296
1974
50,066
1975
29,674
Having stipulated to the underpayment the only question present is whether such underpayment was due to intent by Mr. Enterline to evade tax. In each year the understated income was more than 100 percent of reported income. Discrepancies of 100 percent and more between Mr. Enterline's net income and reported income for 5 successive years strongly evidence an intent to defraud the Government. See Rogers v. Commissioner,111 F.2d 987, 989 (6th Cir. 1940). Further, in the instant case the unreported income arose from the same source each year. None of the misappropriated funds was reported on his tax returns for the years in issue. Thus there was a consistent omission of the misappropriated funds from reported income. Further evidence of Mr. Enterline's intent to evade tax is the elaborate and sophisticated method in which he concealed the misappropriation of funds from his employer. While we recognize that intent to defraud one's employer is not direct evidence of intent to evade tax, we do not *398 hesitate to infer therefrom that petitioner would also attempt to conceal his receipt of those proceeds from the Government with intent to evade tax. McGee v. Commisisoner,supra at 260. Mr. Enterline argues that, because he was unaware that the misappropriate proceeds were taxable income, he could not have had the requisite intent to evade tax. We are unable to accept his argument.Nearly 10 years prior to the first tax year here in issue the Supreme Court held embezzled proceeds were taxable income.See James v. United States,366 U.S. 213 (1961). Mr. Enterline was an accountant. He apparently had little trouble understanding the long form tax return and the schedules attached thereto. He was a hard working man whose efforts raised him to treasurer of the firm. As treasurer his responsibilities included preparing financial statements and reports which were filed with various regulatory agencies. Further, Mr. Enterline admitted he received, read and used the standard tax package containing blank tax returns with schedules as well as instruction for completing the returns. The instructions for all of the years in question clearly listed embezzled *399 income as taxable income. We cannot believe that a man of Mr. Enterline's intelligence, background and ability was unaware that embezzled proceeds were taxable income.Accordingly we do not accept as credible his testimony on this point. The consistent omission of the misappropriated funds, the extent to which Mr. Enterline went to conceal these misappropriations, combined with his knowledge of tax matters, establish by clear and convincing evidence that he intended to defraud the Government in each of the years in issue.Therefore, we sustain respondent's additions to tax under section 6653(b) for fraudulent failure to report income.Issue 2: Innocent Spouse--Mrs. Enterline
Under section 6013(e) a spouse is considered to be innocent of wrongly omitted income even though she joined in the filing of a return under section 6013(a) if three prerequisites are met: (1) the income omitted is attributable to the other spouse and exceeds 25 percent of the gross income stated in the return; (2) the spouse did not know, and had no reason to know, of the omission; and (3) after considering all facts and circumstances and whether the spouse derived substantial benefit from the omitted income, *400 it is inequitable to hold the spouse liable for the deficiency resulting from the omission. The parties have stipulated that the first condition has been met. After considering the testimony and other evidence, we conclude that Mrs. Enterline has satisfied the second and third conditions and is therefore entitled to relief from liability under section 6013(e). The record clearly shows that Mrs. Enterline lacked actual knowledge of the omissions from income on their joint return. As we stated in our findings of fact, Mrs. Enterline signed the returns before they were filled out. She did not examine the returns and her husband did not keep her apprised of his business affairs. Mrs. Enterline further testified that she had no knowledge of the omission of income from the returns, and she impressed us as a credible witness. We find that she did not have actual knowledge during any of the years in issue of the omissions of income from the tax returns. The next question presented is whether Mrs. Enterline has established that she had no reason to know of the income omitted from the returns. The test applied is whether a reasonable taxpayer in similar circumstances would not be *401 expected to have knowledge of the omitted income. Sanders v. United States,509 F.2d 162, 166-67 (5th Cir. 1975). Factors considered in determining whether a reasonable person would know of the omitted income include, but are not limited to: (1) unusual or lavish expenditures; (2) participation in the business affairs or bookkeeping; and (3) complexity of the financial transactions that produced the funds. Mysse v. Commissioner,57 T.C. 680, 699 (1972); Sonnenborn v. Commissioner,57 T.C. 373, 381-82 (1971), and Sanders v. United States,supra at 168. Respondent contends that the expenditures for the 1971 Cadillac and new furniture were unusual or lavish. The lavishness of an expense must be measured from each family's relative level of ordinary support. If the expenditures represent an ordinary support expense, then petitioner would neither be apprised of the omission nor substantially benefited. Section 1.6013-5(b), Income Tax Regs. and Mysse v. Commissioner,supra at 698. In the instant case we have a family whose standard of living was reasonably high but substantially unchanged during *402 all of the years here in issue. While the expenditures for the car and furniture were substantial in amount, it cannot be said that in relation to their standard of living the expenditures were lavish. Further, during the years in issue Mrs. Enterline was aware that her husband had borrowed money, eventually up to $15,000, to help pay for family expenditures. Mrs. Enterline did not assist in the bookkeeping or business affairs of Mr. Enterline. Primarily she used the PNB joint checking account, whereas most of the misappropriated funds were deposited in the MB account. Further, she never saw the statements of either account. Thus she would not have reason to know of the existence, or the amount, of the misappropriations. Mr. Enterline was a master at concealing the embezzled proceeds; over a 12-year period he misappropriated over $400,000. Most of it was used to purchase securities. Though HAH was audited at least 5 times a year and in some years 9 times, neither the firm, the audit by CPA firms, nor the Securities and Exchange Commission detected the embezzlement. We see no reason why Mrs. Enterline should have known about the embezzlement when those professionally trained *403 to ferret out such activity were unable to do so. See Mysse v. Commissioner,supra at 698. Respondent contends that, because Mrs. Enterline was advised of her husband's misappropriation of funds in November of 1975, as to that year she had actual knowledge. We disagree. The record clearly establishes to our satisfaction that, although Mrs. Enterline was aware that her husband had misappropriated funds from HAH, she had no actual knowledge of when this occurred or whether it had been repaid by February 1976 when she signed the return.
Mr. Enterline continued to work for HAH after he admitted his actions to his employer. The purpose of his continued employment was to straighten out the books. Further, the Schedule D attached to the 1975 return listed 73 capital gain or loss transactions during the year and 43 of those occurred after November 5, 1975. Thus we do not believe that Mrs. Enterline knew, or reasonably should have known, of the omission on the 1975 tax return. [1]
The last question presented is whether, *404 after taking into consideration all the facts and circumstances, Mrs. Enterline derived substantial benefit from the omitted income and whether it is inequitable to hold her liable for the deficiency resulting therefrom. Respondent contends that because the amounts expended for family support substantially exceeded Mr. Enterline's reported adjusted gross income, Mrs. Enterline significantly benefited from the omission. Respondent appears to be contending that, where a petitioner expends substantially more on his family than his actual salary, then the difference represents either (1) a significant benefit to the petitioner's spouse, or (2) lavish expenditures. At first glance respondent's argument is very appealing. However, it does not withstand close scrutiny. Whether a taxpayer qualifies as an innocent spouse is primarily a question of fact. Thus, the argument made by respondent, while a possibly helpful guide, cannot serve as a hard and fast rule for determining what is "significant benefit." In the instant case Mrs. Enterline was unaware of what her husband was paid. Frankly, even the Court was surprised to learn that Mr. Enterline's salary was only $16,700 a year in *405 light of the long hours worked and major responsibilities held by him. One of the key factors in determining whether there was a significant benefit or lavish expenditure is to look to the application of the funds. As we stated supra, the misappropriated funds spent by Mrs. Enterline were used primarily for the ordinary support of the family.Further, the family's standard of living went unchanged during the years in issue. Under respondent's regulations this is not significant benefit within the meaning of section 6013(e)(1)(C). Section 1.6013-5(b), Income Tax Regs. Nor do we think that the vacation lot worth $3,800 can be seen as a significant benefit. Finally, respondent contends, since the stocks purchased with the misappropriated funds were liquidated and the proceeds therefrom used in subsequent years for the support of Mrs. Enterline and the four children, that this represents significant benefit to Mrs. Enterline. Benefit received in subsequent years can be taken into consideration in determining whether the claiming spouse significantly benefited. Section 1.6013-5(b), Income Tax Regs. However, petitioners also had to borrow $15,000 from Mrs. Enterline's parents in *406 order to have sufficient funds to support her and the children. Therefore, on the record here present we find that use of omitted income for ordinary support in subsequent years does not mean Mrs. Enterline "significantly benefited" within the meaning of section 6013(e)(1)(C). After a thorough review of the facts and circumstances of this case and in light of our finding that Mrs. Enterline did not significantly benefit from the omitted income, we conclude that it would clearly be inequitable to charge her with the tax liabilities incurred by her husband on his unreported income. Decision will be entered under Rule 155 in docket No. 8101-78.
Decision will be entered for petitioner in docket No. 7438-78.
Footnotes
1. Compare Anderson v. Commissioner,T.C. Memo. 1975-104 and Bonhag v. Commissioner,T.C. Memo. 1980-138↩.