PHILIP D. QUINT AND FRANCINE L. QUINT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Quint v. Commissioner
Docket No. 4631-83.
United States Tax Court
T.C. Memo 1985-226; 1985 Tax Ct. Memo LEXIS 411; 49 T.C.M. (CCH) 1465; T.C.M. (RIA) 85226; May 9, 1985. *411 Held, petitioner is an innocent spouse within the meaning of sec. 6013(e), I.R.C. 1954, and is therefore relieved from liability for the deficiencies in income taxes for the years in issue. Gerald H. Lean, for the petitioners. Agnes Gormley, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated December 6, 1982, respondent determined deficiencies in Federal income taxes for the years 1978, 1979, and 1980 against Philip D. Quint and Francine L. Quint in the respective amounts *412 of $11,313, $12,448, and $3,719. Respondent also determined that Philip D. Quint is liable for the addition to tax under section 6653(b), I.R.C. 1954, for the years 1978, 1979, and 1980 in the respective amounts of $5,657, $6,224, and $1,860. Philip D. Quint has conceded that he is liable for the determined deficiencies and additions to tax. Francine L. Quint has conceded that, if she is found liable for any deficiency for 1978, 1979, or 1980, she is liable for the amounts determined by respondent. The sole issue for decision is whether Francine L. Quint (hereinafter referred to as petitioner) is an innocent spouse within the meaning of section 6013(e), so as to be relieved from liability for the deficiencies in income taxes for the years in issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. At the time they filed their petition herein, Philip D. Quint and Francine L. Quint resided at 2027 Jolly Road, Baltimore, Maryland. They timely filed joint Federal income tax returns for 1978, 1979, and 1980 with the Internal Revenue Service *413 Center, Philadelphia, Pennsylvania. Petitioner is a high school graduate and has participated in continuing education courses. At the time of the trial herein petitioner and Mr. Quint had been married for 22 years. The couple had 3 children who, during the years in issue, ranged from age 7 to age 16. Petitioner worked in public relations during the marriage. Beginning in 1978 petitioner became personnel director of a corporation in Baltimore. Mr. Quint was an attorney in the private practice of law. From 1976 through August 1980 Mr. Quint was employed by the State of Maryland as a legal officer in the Single Family Homes Program, which provided low-interest mortgages to families who satisfied certain economic criteria. While acting as a legal officer for the State of Maryland, Mr. Quint deposited the proceeds from foreclosure sales into his separate business account maintained for his private law practice and converted the proceeds to his personal use from late 1976 through August 1980. During 1978, 1979, and 1980, Mr. Quint misappropriated funds from the State of Maryland in the respective amounts of $31,475, $26,866, and $33,755. Unbeknownst to the state agency employing *414 him and to petitioner, Mr. Quint was disbarred as an attorney in December 1978 for illegally misappropriating clients' funds. Mr. Quint was confronted by representatives of the Attorney General's office and fired from his job with the State of Maryland on August 19, 1980. On that date, he issued a check to the state for $35,358.87, which he represented as the amount that he owed to the state. That evening, Mr. Quint told petitioner of the confrontation and of the fact that he had been fired. Prior to that time, petitioner knew nothing about the misappropriations. On the following day, petitioner and Mr. Quint borrowed $8,000 from various family members and executed a series of promissory notes totaling the same amount for the purpose of covering the check Mr. Quint had written to the state on the previous day. Mr. Quint informed petitioner that he had repaid the full amount of the misappropriated funds, and petitioner believed him. Mr. Quint hired his brother-in-law, an attorney, to represent him following the August 19, 1980 confrontation with representatives of the Attorney General's office. Petitioner did not attend any meetings between Mr. Quint and his attorney, nor did *415 the attorney ever discuss the case with her. Mr. Quint was formally charged on March 2, 1981 with unlawfully, fraudulently, and willfully embezzling and misappropriating funds. On April 28, 1981 Mr. Quint pled guilty. After her husband's defalcations were discovered in August 1980, petitioner went to work full time and assumed primary responsibility for supporting the family. Petitioner and Mr. Quint did not report the funds misappropriated from the State of Maryland as income on their 1978, 1979, and 1980 joint Federal income tax returns. The returns for those years reported income in the following amounts: 1978
1979
1980
Husband's wages--
State of Maryland
$20,639
$22,433
$17,306
Wife's wages
2,499
6,494
11,594
Net income from law practice
843
380
5,084
Interest and state tax refund
361
1,079
1,039
Unemployment compensation
2,160
Total reported
$24,342
$30,386
$37,183
The returns for these years also reflect the following expenses: 1978
1979
1980
Total medical expenses
$ 2,757
$ 1,501
$ 1,790
Taxes
3,170
3,190
3,245
Interest
5,071
5,369
4,493
Contributions
830
948
980
Miscellaneous
245
294
94
Child care
3,455
2,685
4,550
Storm windows or doors
2,015
IRA contribution
1,700
FICA and Federal income tax
withheld
3,960
5,279
5,826
Total
$21,503
$19,266
$22,678
*416 As previously stated, Mr. Quint maintained a separate bank account for his legal practice. He kept the records of that account at his office, and petitioner, who did not keep apprised of her husband's business affairs as an attorney, did not have access to those records. During the years in issue Mr. Quint paid the following nonbusiness expenses from his separate business bank account: 1978
1979
1980
Mortgage payment
$ 5,060
$ 4,144
$ 3,256
Car repairs & insurance
1,000
821
154
Health & other insurance
1,530
237
Tennis club and summer camp
1,911
829
1,824
Ocean City condo
325
Las Vegas trip
2,884
1,725
3,100
Colts tickets
200
House utilities & lawnwork
1,108
1,704
766
Refrigerators, mirrors, rug,
storm windows, etc.
655
1,851
628
Checks made to the order of cash
and to himself
3,959
7,589
6,365
Loan repayment
1,049
514
Other
1,500
591
425
Total
$20,656
$20,293
$16,755
In 1978 Mr. Quint also wrote a $3,200 check on his separate account to pay for a car to be used by his father. His father subsequently reimbursed him for the purchase. Petitioner and her husband maintained joint personal checking *417 accounts, which were used and balanced almost exclusively by petitioner. In 1978 they maintained a checking account with Maryland National Bank, and in 1979 and 1980 they maintained a checking account with Equitable Trust Bank. The accounts were active checking accounts and did not accumulate any significant savings. The parties have stipulated that the following deposits were made to those accounts: 10 months in 1978
$12,747
(statements for 2 months
in 1978 are unavailable)
1979
16,468
1980
33,292
According to petitioner, she deposited into the joint accounts, her salary, her husband's paychecks from the State of Maryland, and some additional money that her husband gave her from time to time. Mr. Quint turned his paychecks over to petitioner, and she, in turn, deposited those paychecks, occasionally retaining $50 to $75 in cash for spending money. Petitioner signed virtually every check drawn on these joint personal checking accounts. Although not all of the checks drawn on these accounts were available for examination, the bank statements reveal that 301 checks were written during 10 months in 1978, 380 checks were written in 1979, and 521 checks *418 were written in 1980. Petitioner used the funds in the joint checking account to pay for various types of personal expenses and household expenses. Generally, Mr. Quint made the mortgage payments on the couple's home, which had been purchased in December 1975, and paid the telephone, utilities, and general maintenance bills out of his separate business account. Mr. Quint also paid the cost of sending the couple's children to summer camp. On occasion, Mr. Quint would give petitioner blank, signed checks from his business account to enable her to pay bills or to make purchases. During the years 1978, 1979, and 1980 neither petitioner nor her husband made any unusual or lavish expenditures. In addition, petitioner did not receive any unusual or extravagant gifts from her husband. Although petitioner took a trip to Las Vegas with Mr. Quint in each of the years in issue, the couple had taken at least one vacation trip a year throughout their marriage and in fact had made annual trips to Las Vegas for 3 or 4 years prior to 1978. Also prior to 1978 petitioner had taken trips to Ocean City with her parents. She continued to do so during the years in issue. Petitioner wrote checks *419 to pay for the lodging in Ocean City; however, petitioner's father apparently gave her money to pay for the Ocean City trips. As was their practice every summer, petitioner and her husband sent one or more of their children to summer camp during the years in issue. Their children also went skiing at Ski Roundtop in Pennsylvania, which is about 60 minutes from the family's home. Although Mr. Quint belonged to the Mercantile Country Club for a short period of time, which apparently covered two of the years in issue, petitioner did not belong to that club and rarely used it. The Quints' returns for the years in issue were prepared by an accountant. The extent of petitioner's participation in the preparation of those returns was limited to gathering information from her checkbooks and turning that information over to her husband. Petitioner did not examine the returns before she signed them. The 1980 return was signed by the accountant on March 12, 1981 and by petitioner and Mr. Quint approximately 10 days thereafter. At the time petitioner signed the 1980 return, she knew that Mr. Quint had been formally charged with embezzling funds. OPINION Petitioner seeks to be relieved *420 of liability for the deficiencies in income tax reported on the joint returns for 1978, 1979, and 1980 under the so-called innocent spouse provisions of section 6013(e). [1] To qualify her for such relief the evidence must show for each year that: (1) on such year's return there is a substantial understatement [2] of tax attributable to grossly erroneous items [3] of petitioner's spouse; (2) petitioner did not know and had no reason to know of the substantial understatement; and (3) taking into account all of the facts and circumstances, it is inequitable to hold petitioner liable for the deficiency attributed to such understatement. The parties agree that the first condition is satisfied. [4] It is the second and third conditions that are in dispute. *421 We begin by focusing on the condition that petitioner did not know and had no reason to know of the substantial understatement. In determining whether petitioner actually knew of the omissions from income that resulted in substantial understatements for each of the years in issue, we necessarily must rely in large part on petitioner's own testimony and our evaluation of her credibility. The record establishes to our satisfaction that petitioner did not have actual knowledge of the omitted income. We believe her testimony that she did not review the returns before she signed them and her general denial of actual knowledge of the omissions. The question of whether she had reason to know of the omissions is more difficult. The test to be applied is whether a reasonably prudent taxpayer in similar circumstances would not be expected to have knowledge of the omitted income. Sanders v. United States,509 F.2d 162, 166-167 (5th Cir. 1975). Respondent advances several arguments to support his position that petitioner had reason to know of the omissions from income.His primary argument is that the family's expenditures so substantially exceeded the income reported on *422 the returns that petitioner should have been put on notice that something was awry. Respondent has calculated an excess of expenditures over reported income of $25,782 in 1978, $20,638 in 1979, and $29,981 in 1980. Petitioner objects to respondent's calculations on the basis that many of the figures used in the calculations are duplicative. Petitioner has calculated an excess of expenditures over reported income of only $506 in 1978 and $3,121 in 1980 and an excess of reported income over expenditures of $5,461 in 1979. Having reviewed respondent's calculations, we are included to agree with petitioner that, at least in theory, certain of the expenditures taken into account by respondent may be duplicative or otherwise in error. For example, in calculating expenditures, respondent took into account checks drawn on Mr. Quint's separate business account and made payable to the order of cash or to Mr. Quint and also assumed that total deposits to the joint checking account were expended. However, petitioner testified that, from time to time, she deposited into the joint account, cash given to her by her husband. Thus, by taking both of the foregoing items into account as distinct *423 and separate items of expenditure, respondent may well be guilty of doubling up on the total amount of expenditures. Respondent also viewed as an expenditure, a $3,200 check drawn on Mr. Quint's separate account for the purchase of a car. However, petitioner testified that the car was purchased for Mr. Quint's father and that Mr. Quint was reimbursed by his father several days later. We believe petitioner's testimony on this point; therefore, it is erroneous to include the $3,200 check as an item of expenditure. In addition, respondent considered expenses reflected on the 1978, 1979, and 1980 tax returns as separate expenses, without taking into account that some of the expenses may have been paid out of the deposits to the joint account, which respondent had already counted as expenditures. In his calculations, respondent also considered the total amount of FICA and Federal income taxes withheld during 1978, 1979, and 1980 as expenditures; however, he failed to give petitioners credit for refunds of Federal income tax of $2,046 and $1,172 attributable to 1978 and 1979, respectively. Suffice it to say that respondent's calculations are too riddled with errors to be of much use to *424 us. At the same time, it appears that petitioner's calculations may be equally faulty in the opposite direction. The parties stipulated that petitioner's deposits to the joint checking accounts totaled $12,747 during 10 months in 1978, $16,468 in 1979, and $33,292 in 1980. However, petitioner testified that she deposited her salary, the entire amount of her husband's paychecks from the State of Maryland (with the exception of an occasional $50 to $75 of cash retained from those checks), and additional cash that her husband would give her from time to time. The amount of petitioner's salary and Mr. Quint's salary from the State of Maryland amounted to $23,138 in 1978, $28,927 in 1979, and $28,900 in 1980. Obviously with respect to the amount of deposits in 1978 and 1979, the stipulation and petitioner's testimony are inconsistent. [5] Petitioner's calculations comparing expenditures to income assume that all deposits to the joint account were expended during the years in issue. In making this assumption, petitioner further assumes that deposits equaled those stipulated to rather than those petitioner testified to. Petitioner's calculations fail to account for the destiny of *425 the excess of the salaries in 1978 and 1979 over the deposits as stipulated to; therefore, it is not at all unlikely that petitioner's calculations may be marred by omitting certain expenditures. In short, neither respondent's nor petitioner's calculations represent a satisfactory comparison of total expenditures to total reported income. Moreover, having reviewed the entire record, we have concluded that any attempt on our part to reconstruct such a comparison would be entirely too speculative to serve as a basis for determining whether expenditures exceeded reported income to such an extent that petitioner should have been alerted to the misappropriations. Even assuming that petitioner knew that the family was spending more than the aggregate of her salary and her husband's salary from the State of Maryland, which we do not necessarily believe is true, that knowledge would not have been sufficient to put petitioner on notice of her husband's misappropriations. Petitioner testified that she was unaware of the fact that her husband had been disbarred from the practice of law in 1978. We find petitioner's testimony in this *426 respect to be credible. After all, Mr. Quint was demonstrably a master at concealment as proven by his ability to misappropriate funds from the State of Maryland while acting as a legal officer from late 1976 through August 1980, during part of which time, of course, he was disbarred from the practice of law. Given that petitioner was unaware that her husband had been disbarred, it was reasonable for her to assume that her husband was generating income from his private law practice. Respondent contends that the family's lavish lifestyle should have given petitioner reason to question the source of the funds. While it is certainly true that "a spouse cannot close her eyes to unusual or lavish expenditures, or to other facts, that might give her reason to know of the unreported income", ( Terzian v. Commissioner,72 T.C. 1164, 1170 (1979)), the record does not support respondent's contention that the Quints enjoyed a luxurious lifestyle and made lavish expenditures during the years in issue. The lavishness of an expense must be measured from each family's relative level of ordinary support. [6] The use of unreported income to provide ordinary support would not *427 ordinarily give a spouse reason to know of the income's existence within the meaning of section 6013(e). Mysse v. Commissioner,57 T.C. 680, 698 (1972). Looking to the facts of this case, we see a family whose standard of living was reasonably high but substantially unchanged during the years in issue. The fact that the family's lifestyle was substantially unchanged during the years in issue is hardly surprising, given that prior to those years Mr. Quint's private law practice served as an additional source of income. In arguing that the expenses paid to send petitioner's children to summer camps and the expenses incurred in vacationing were "lavish" expenditures, respondent totally ignores the fact that the Quints had incurred similar expenses for a number of years prior to the years in issue. In our view there was no reason for petitioner suddenly to view these expenditures as unusual. Furthermore, petitioner testified with respect to the Ocean City vacations that her parents always paid for those trips.Respondent's assertion that the Quints lived an extravagant lifestyle as witnessed *428 by their membership in a country club and their habit of patronizing an out-of-town ski resort seems stretched, at the very least. Only Mr. Quint was a member of the Mercantile Country Club, and his membership was short-lived. With respect to respondent's assertion that the Quints patronized a ski resort, petitioner testified that Ski Roundtop is not a resort to them but was simply a place to go skiing about 60 minutes away from the Quints' home. She further testified that her children had visited Ski Roundtop, but that she had never been there. Based on petitioner's testimony, which we credit, it seems relatively clear that petitioner's children made occasional day trips to Ski Roundtop. We scarcely find that fact indicative of an extravagant lifestyle. Respondent also contends that petitioner is not a naive or unsophisticated person, that she assisted in the preparation and filing of the income tax returns for the years in issue, and that she had a sound knowledge of the family finances and of her husband's business account. While petitioner impressed us as a reasonably intelligent person, we think that respondent reads entirely too much into the record. Petitioner credibly *429 testified that the extent of her participation in the preparation of the income tax returns was limited to gathering information from her checkbooks and turning that information over to her husband. While we do not intend to imply that we condone petitioner's failure to examine the returns that she signed, we believe that, in fact, she did not examine these returns and that she by and large left the preparation of the returns to her husband and the accountant. Respondent's contention that petitioner had a sound knowledge of her husband's separate business account finds very little, if any, support in the record. The record indicates, and we have found as a fact, that petitioner did not keep apprised of her husband's business affairs as an attorney, nor did she have access to the records of his business account. There is essentially no evidence in the record to contradict this finding. Respondent contends that, because petitioner was advised of her husband's misappropriations as early as August 19, 1980 and knew that her husband had been formally charged on March 2, 1981 with embezzling and misappropriating funds, petitioner had knowledge of the omission from gross income at least *430 with respect to the 1980 taxable year. While admittedly a closer case, we on balance disagree. The record establishes to our sufficient satisfaction that, although petitioner was aware at the time she signed the 1980 return that her husband had misappropriated funds from the State of Maryland, she believed, based on her husband's assurance, that all of the misappropriated funds had been repaid in August 1980. Thus, we do not believe that petitioner knew, or reasonably should have known, of the omission on the 1980 return. Having found that petitioner neither knew nor reasonably should have known of the substantial understatements of tax for 1978, 1979, and 1980, we shift our focus to the remaining condition for relief under section 6013(e); that is, whether, taking all of the facts into consideration, it is inequitable to hold petitioner liable for the deficiency attributable to those understatements. Whether petitioner significantly benefited from the substantial understatements is a factor to be considered in making this determination. [7]
*431 Respondent contends that petitioner significantly benefited from the income that was omitted from the returns during the years in issue because the Quints enjoyed a standard of living far higher than would have been possible on the amounts reported on their income tax returns. Respondent's argument has some appeal; however, it does not find support in the decided cases. It is well settled that a significant benefit does not exist in a situation where the omitted income is used primarily for the normal support of the family. Section 1.6013-5(b), Income Tax Regs.; Terzian v. Commissioner,supra at 1172; Mysse v. Commissioner,supra at 698-699. In the instant case, as we previously stated, we fail to see any unusual or lavish expenditures during the years in issue or any noticeable change in the family's style of living during those years. Finally, respondent, emphasizing that the Quints had been married for 22 years and were still married at the time of trial, contends that the relief provisions of section 6013(e) were intended primarily for the benefit of spouses who are deserted, divorced, or separated.Since petitioner was not placed *432 in any of those situations, respondent argues that it is not inequitable, within the meaning of the statute, to hold her liable for the deficiencies. S. Rept. No. 91-1537 (1970), 1971-1 C.B. 606, 608. There is nothing in section 6013(e) to indicated that its relief was intended to be limited to spouses who are victims of broken marriages. Mysse v. Commissioner,supra at 700. The above-referenced committee report indicates that whether the spouse has been separated or divorced is only one of the factors to be considered in determining whether it is inequitable to hold her liable for the deficiencies. We do not believe that petitioner herein is to be denied relief simply because she is still married to her husband. Moreover, we note that after Mr. Quint's defalcations were discovered, petitioner dutifully assumed the primary responsibility of supporting her family. After a review of the facts and circumstances of this case and in light of our finding that petitioner did not significantly benefit from the omitted income, we conclude that it would be inequitable to charge her with the tax liabilities incurred by her husband on his unreported income.
*433 Decision will be entered under Rule 155.
Footnotes
1. After trial and briefing herein sec. 6013(e)↩ was amended by the Tax Reform Act of 1984 with retroactive application to all taxable years to which the Internal Revenue Code of 1954 and of 1939 applies. See Pub. L. 98-369, sec. 424, 98 Stat. 801; H. Rept. No. 98-432, Pt. 2 (Mar. 5, 1984) 1501, 1503. 2. A "substantial understatement" means an understatement that exceeds $500. Sec. 6013(e)(3)↩. 3. "Grossly erroneous items" include omissions from gross income. Sec. 6013(e)(2)↩. 4. Sec. 6013(e) as in effect at the time of trial and briefing herein required an omission from gross income in excess of 25 percent of the amount of gross income stated in the return. The parties stipulated that such condition existed for each of the years in issue. From said stipulation it is clear that the parties agree that there was a "substantial understatement" of tax attributable to a "grossly erroneous item", as those terms are defined under amended sec. 6013(e)↩, for each of the years in issue.
5. Part of this inconsistency is due to withholding.↩
6. Enterline v. Commissioner,T.C. Memo. 1980-200↩.
7. Section 6013(e)(1)(C), prior to its amendment, explicitly required that we consider "whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income * * *." While section 6013(e), as amended, does not specifically require that the determination of whether it would be inequitable to hold the spouse liable include the consideration of whether such spouse benefited from the erroneous items, that factor should continue to be taken into account. See H. Rept. No. 98-432, Pt. 2 (March 5, 1984), supra↩ at 1502.