JAMES BOUSKOS and AGATHA BOUSKOS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JAMES M. BOUSKOS and AGATHA BOUSKOS, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bouskos v. Commissioner
Docket Nos. 16819-81; 19067-84.
United States Tax Court
T.C. Memo 1987-574; 1987 Tax Ct. Memo LEXIS 574; 54 T.C.M. (CCH) 1117; T.C.M. (RIA) 87574; November 19, 1987. John E. Lahart and Darlene Marie Azevedo for the petitioners. Theodore Garelis for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined deficiencies in petitioners' 1976 and 1977 Federal income taxes in the amounts of $ 38,026 and $ 2,475, respectively. Petitioners concede the deficiency determinations; the sole issue for decision is whether Agatha Bouskos *575 (Aggie) [1] qualifies for relief from liability as an "innocent spouse" under section 6013(e). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Fresno, California at the time the petition in this case was filed. They were married in 1975 and filed joint income tax returns for both years in issue. On August 20, 1983, petitioners separated; they were divorced on March 15, 1985. During the years in issue, petitioners James Bouskos (James) and his brother were equal partners in J&E Enterprises (J&E), a California partnership. J&E, in turn, was a limited partner in the Cumberland Group (Cumberland), a California limited partnership which was formed in 1976 purportedly to lease and mine certain coal properties in West Virginia. The deficiencies herein result from respondent's disallowance *576 of losses of $ 90,495 and $ 4,282 claimed by petitioners on their 1976 and 1977 tax returns, respectively, which were derived from Cumberland and which passed through to J&E and then to petitioners. [3]
Aggie did not participate in the activities of J&E or in any of her husband's other business activities, nor did James discuss business matters with her. Throughout their marriage petitioners enjoyed a high and constantly increasing standard of living. Shortly after their marriage in 1975, they purchased a large house in Monte Sereno, California, which they extensively remodeled and decorated in 1977. However, Aggie never saw the bills for the cost of remodeling. She believed the source of funds for these expenditures was a profitable coffee investment transaction engaged in by James and his brother. Petitioners subsequently sold their Monte Sereno house and used the proceeds to purchase a house in Fresno, California, which *577 was Aggie's residence at the time of trial. Aggie never attended college or business school, and she had limited knowledge of financial matters. James, on the other hand, was a college graduate, and was knowledgeable in business matters. During both years in issue, he managed one of three grocery supermarkets owned by his family. His compensation for this was $ 102,290 in 1976 and $ 113,185 in 1977. He also received $ 120,411 in 1977 as his share of a coffee investment transaction. James first learned of Cumberland through his brother. He made no independent investigation of the merits of the investment, but rather he relied on the recommendations of others. He made the investment without first consulting with Aggie. [4] Although he read the private placement memorandum, he did not understand the various risks in the transaction. His primary purpose in making the investment was to obtain tax benefits. James controlled all family finances *578 during 1976 and 1977. He and Aggie did not maintain a joint checking account. Instead, James established a checking account for Aggie and gave her a check for $ 300 each month, which Aggie used for her personal expenses and for babysitters. Aggie obtained the family groceries "free" by shopping at the supermarket which James managed. James maintained a separate checking account to which Aggie did not have access. All income which James received, whether separate or community, was deposited into his separate account. During 1976 and 1977, he paid the family's living expenses with funds from his separate account. Aggie did not review or pay bills during these years nor did she examine James' bank statements. Aggie did not know the level of her husband's income from the time they were married in 1975 until at least after 1977. She never saw any of her husband's salary checks. James employed an accountant with whom his family had a long-term relationship to prepare his and Aggie's joint returns. Aggie had never spoken to this accountant prior to 1984. The accountant prepared the returns from information provided by James, who would go through his checks and receipts and *579 then relay the information to the accountant. When the completed return was sent to petitioners for signing, James would only glance at it, while Aggie would not read the return at all. Aggie did not provide any information for the returns to the accountant. Aggie had no tax or business background. She described herself as a "dutiful wife" who completely trusted her husband to manage their financial affairs in a way that would benefit their family. When James presented business documents for her signature, she would sign the documents generally without reading or attempting to understand them. Aggie claims that she was unaware of the tax refunds that resulted from the Cumberland losses claimed on the 1976 and 1977 tax returns. She does not recall signing the returns, nor does she recall looking at the figures on the returns that showed that refunds were due. OPINION Spouses filing a joint tax return are jointly and severally liable for the tax arising therefrom. Section 6013(d)(3). However, if a taxpayer spouse satisfies the requirements of section 6013(e), he or she is relieved from such joint and several liability. In order to invoke the protection of section 6013(e), *580 Aggie must satisfy all of the following six requirements with respect to each taxable year involved: (1) a joint return was filed (section 6013(e)(1)(A); (2) such return contains a substantial understatement of tax (sections 6013 (e)(1)(B); and (e)(3)); (3) the substantial understatement is attributable to grossly erroneous items of James (section 6013(e)(1)(B); and (e)(2)) (4) in signing the return, she did not know, and had no reason to know, that there was such a substantial understatement (section 6013(e)(1)(C)); (5) taking into account all the facts and circumstances, it is inequitable to hold her liable for the deficiency in tax attributable to such substantial understatement (section 6013(e)(1)(D)); and (6) the understatement exceeds a specified percentage of the adjusted gross income for her preadjustment year (section 6013(e)(4)). [5]
*581 A failure to meet any of the aforesaid requirements will prevent Aggie from qualifying for relief under section 6013(e). The parties have stipulated that joint returns were filed for 1976 and 1977, both of which contained substantial understatements of tax pursuant to sections 6013(e)(1)(A), (e)(1)(B) and (e)(3). In addition, the parties have stipulated that the 1976 deficiency exceeds 25 percent of Aggie's adjusted gross income for the preadjustment year for the 1976 deficiency. Finally, respondent conceded on brief that the 1977 deficiency exceeds 25 percent of Aggie's adjusted gross income for the preadjustment year for the 1977 deficiency. Section 6013(e)(4). Thus, there is no dispute as to Aggie's satisfying three of the six requirements. We now turn to the first of the factors which remains for Aggie to prove, i.e., whether the substantial understatements of tax on the 1976 and 1977 returns are attributable to grossly erroneous items of James. Section 6013(e)(1)(B). To be considered "grossly erroneous," the deductions must be without basis in fact or law. Section 6013(e)(2)(B). The deductions disallowed by respondent derived from James' investment in Cumberland. *582 The facts surrounding Cumberland and deductions such as those involved herein were the subject of a detailed analysis by this Court in Tallal v. Commissioner,T.C. Memo. 1984-486, 53 P-H Memo T.C. par. 84,486, 48 T.C.M. 1082, affd. 778 F.2d 275 (5th Cir. 1985). In Tallal, we disallowed all of the deductions claimed by the taxpayers, who was a limited partner in Cumberland. Cumberland was a limited partnership formed purportedly to lease and mine coal property in West Virginia; however, none of the organizers of Cumberland had any experience in coal mining prior to their involvement with Cumberland. Cumberland never sold any coal; the partnership reported no income in 1976 and only small amounts of interest income in its taxable years 1977-1980. In denying the deductions flowing from Cumberland, we stated: Cumberland was not conceived or operated with the dominant objective of making a profit from mining and selling coal. When the paper facade is peeled away, Cumberland is revealed to be a mere tax shelter designed to enrich the general partners and provide sizable tax deductions to the limited partners. [Tallal v. Commissioner,T.C. Memo. 1984-486, 53 P-H Memo T.C. par. 84,486 at 84-1949, 48 T.C.M. at 1097.]
*583 We also noted that "there was little substance" to any of the agreements into which Cumberland had entered. Tallal v. Commissioner,T.C. Memo. 1984-486, 53 P-H Memo T.C. par. 84,486 at 84-1953, 48 T.C.M. 1082 at 1100. The legislative history of section 6013(e)(2)(B), which defines grossly erroneous items as including any claims of a deduction for which there is no basis in fact or law, indicates that a deduction has no basis in law when the expense, even if incurred, does not qualify as a deductible expense under well-settled legal principles or when no legal argument can be made no basis in fact or in law can be described as frivolous, fraudulent, or to use the word of the committee report, phony. Douglas v. Commissioner,86 T.C. 758, 762-763 (1986), citing Supplemental Report of Comm. on Ways and Means, H. Rept. 98-432 (Part 2), on H.R. 4170 (Tax Reform Act of 1984) at 1502 (1984). The deductions flowing from Cumberland for the years in issue were "phony"; they had no basis in fact or in law. Accordingly, the deductions derived from the Cumberland losses were grossly erroneous items within the meaning of section 6013(e)(1)(B). *584 Having determined that the deductions were grossly erroneous, we must next determine whether such deductions are "attributable to" James. Although California is a community property state, in this case no actual loss was produced to be shared by Aggie under California community property laws. Cal. Civil Code sec. 687 (West 1982). The transaction that purportedly generated the alleged loss had no legal basis; it is well settled that such transactions do not create actual losses. Price v. Commissioner,88 T.C. 860, 883-885 (1987); Glass v. Commissioner,87 T.C. 1087, 1177 (1986). We therefore conclude that California community property laws do not attribute any of the nonexistent loss to Aggie and that the claimed deductions are attributable entirely to James. Thus, Aggie has met the requirements of sections 6013(e)(1)(B) and (e)(2). Aggie must next prove that she neither knew, nor had reason to know, of the substantial understatements in either the 1976 or 1977 returns. She testified that she trusted James to take care of the family finances and, at least during 1976 and 1977, it was her habit to sign any document her *585 husband asked her to sign. Aggie was a credible witness who provided reliable testimony. In light of her testimony, we do not believe she had actual knowledge of the understatements of tax on the returns. We, therefore, must determine whether Aggie had reason to know of the substantial understatements. The applicable test to determine whether Aggie had reason to know of the substantial understatements in the 1976 or 1977 tax returns is whether a reasonable person in Aggie's circumstances could have been expected at the time of signing the returns. Sanders v. United States,509 F.2d 162, 166-67 (5th Cir. 1975); Terzian v. Commissioner,72 T.C. 1164, 1170 (1979); Mysse v. Commissioner,57 T.C. 680, 697-699 (1972). A factor relevant to such determination is whether any unusual or lavish expenditures were made. Mysse v. Commissioner, supra at 699. Aggie and James enjoyed a high standard of living throughout their marriage. They purchased a home and, in 1977, began redecorating. However, in these circumstances, neither the purchase nor the redecoration of the home could be considered a "lavish" expenditure that *586 would alert a reasonable person in Aggie's position that something was amiss. James had earnings from compensation during 1976 and 1977 of $ 102,290 and $ 113,185, respectively. In addition, James received $ 120,411 from a coffee transaction in 1977. Although Aggie was unaware of James' exact income throughout their marriage, she believed that it was adequate to finance the purchase and remodeling of a house. Aggie received no lavish gifts, and James made no expenditures subsequent to their receipt of the refunds that should have put a reasonable person in Aggie's position on notice that the understatements in tax liability had been made. Petitioners did not experience a quick or drastic increase in their standard of living as a result of the tax refunds. In short, no unusual or lavish expenditures were made that, in our opinion, would give a reasonable person in Aggie's circumstances reason to know of the understatement of tax. Another factor relevant to our determination of whether Aggie had reason to know of the understatements is the degree of her involvement in the family's business affairs. Quinn v. Commissioner,62 T.C. 223 (1974) affd. 504 F.2d 617 (7th Cir. 1975), *587 Sonnenborn v. Commissioner,57 T.C. 373, 381-382 (1971). Aggie had no business education or experience. She did not participate in any of her husband's business activities; in fact, James did not even discuss business with her. James controlled the family finances. The couple did not share a joint checking account; instead, James paid all of the family's living expenses from his separate account, an account to which Aggie did not have access and the balance of which she did not know. Aggie was unaware of her husband's level of income during their marriage. Thus, it is clear that a reasonable person with Aggie's lack of business sophistication and lack of access to the family's financial activities could not reasonably have known of the understatements. Having decided that Aggie neither knew, nor had reason to know, of the substantial understatements of tax, we turn to the final factor that must be proven, i.e., that it would be inequitable to hold Aggie liable for the deficiencies in tax attributable to the substantial understatements. Section 6013(e)(1)(D). The statute and regulations provide that whether it is inequitable to hold a person liable for the deficiency *588 in tax is to be determined on the basis of all the facts and circumstances. Section 6013(e)(1)(D); section 1.6013-5(b), circumstances. Section 6013(e)(1)(D); section 1.6013-5(b), Income Tax Regs. In making such a determination, a factor to be considered is whether Aggie significantly benefited from the understatements. Section 1.6013-5(b), Income Tax Regs.; [6]Purcell v. Commissioner,86 T.C. 228, 241 (1986), affd. 826 F.2d 470 (6th Cir. 1986). Aggie may have received some limited benefit from the tax refunds because she was entirely dependent upon James for her support; she received no *589 income from other sources. However, normal support is not a significant "benefit" for purposes of determining whether denial of innocent spouse relief would be inequitable under section 6013(e)(1)(D). Purcell v. Commissioner, supra at 1172; Mysse v. Commissioner, supra at 699; section 1.6013-5(b), Income Tax Regs.
Normal support is to be measured by the circumstances of the parties. Sanders v. United States, supra at 168. [7] The statute and case law are clear that benefit can be found only where expenditures which are unusual for the taxpayer's accustomed lifestyle have been made. Although Aggie and James enjoyed a high standard of living, there is no indication that Aggie received anything beyond normal support from James as a result of the refunds. The refunds did not cause a sudden or drastic increase in their standard of living. In sum, Aggie received no significant benefit from the tax refunds. Based *590 on the evidence as a whole, we believe it would be inequitable to hold Aggie liable for the deficiencies in tax attributable to the substantial understatements for either 1976 or 1977. To reflect the foregoing, and the concession made by petitioners, Decision will be entered for respondent with respect to petitioner James Bouskos.
Decision will be entered for petitioner Agatha Bouskos.
Footnotes
1. Agatha Bouskos' legal name is now Aggie Bouskos. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. The Cumberland coal mining activity was the subject of a Memorandum Opinion of this Court, Tallal v. Commissioner,T.C. Memo. 1984-486, 53 P-H Memo T.C. par. 84,486, 48 T.C.M. 1082, affd. 778 F.2d 275↩ (5th Cir. 1985). 4. James testified that he discussed the investment with Aggie; Aggie claims that he did not. We believe that if such a discussion occurred, Aggie did not understand the investment nor the deductions attributable to such investment. ↩
5. If the adjusted gross income of the spouse claiming innocent spouse relief for the preadjustment year is $ 20,000 or less, the understatement must exceed 10 percent of such adjusted gross income. Section 6013(e)(4)(A). If such adjusted gross income exceeds $ 20,000, the understatement must exceed 25 percent of such adjusted gross income. Section 6013(e)(4)(B). ↩
6. Section 6013(e) was amended subsequent to the promulgation of section 1.6013-5(b), Income Tax Regs.↩ Prior to its amendment, section 6013(e) required that we consider "whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income." Although section 6013(e), as amended, no longer specifically requires us to determine whether a spouse significantly benefited, it is still a relevant factor in determining whether it is inequitable to hold a spouse liable. See H. Rept. 98-432 (Part 2) 1501, 1592 (1984). 7. See also Quint v. Commissioner,T.C. Memo. 1985-226, 54 P-H Memo T.C. par. 85,226, 49 T.C.M. 1465; Enterline v. Commissioner,T.C. Memo. 1980-200, 49 P-H Memo T.C. par 80,200, 40 T.C.M. 454↩.